**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : |  |
| Plaintiff, | : |  |
|  | : |  |
| V. | : | 1:16-CR-385-DLC-1 |
|  | : |  |
| DAVID W. KENT | : |  |
| Defendant. | : |  |
|  | : |  |

## SENTENCING MEMORANDUM ON BEHALF OF DAVID KENT

THE COGDELL LAW FIRM, PLLC
Dan L. Cogdell
402 Main Street, 4th Floor
Houston, Texas 77002
Tel:    (713) 426-2244 (phone)
Fax:    (713) 426-2255 (facsimile)
Email:  dan@cogdell-law.com


SPEARS & IMES LLP
David Spears
51 Madison Avenue
New York, New York 10010
Tel:    (212) 213-6991
Fax:    (212) 213-0849
Email:  dspears@spearsimes.com

**Introduction and Overview**

David Kent respectfully files this sentencing memorandum addressing the mandatory factors outlined in 18 U.S.C. § 3553(a). A non-guideline sentence is "sufficient, but not greater than necessary" in this case. *Id.* Probation agrees, and has recommended a below-the-guideline sentence of 36 months. The purpose of this memorandum is to detail matters not addressed by the exceptional work in the Presentence Investigation Report ("PSR") and to highlight why a below the guidelines sentence is appropriate.



. Mr. Kent's charity work began in college, more than 20 years ago, where he volunteered hundreds of hours for Habitat for Humanity and Big Brothers and Big Sisters of America. Mr. Kent has never lost this charitable nature. More recently, he donated a home to a low-income family—a single mother with three children—who could not afford one. In another incredible act of kindness, Mr. Kent purchased a home for his friend, Troy Caraway, who, at one point in life, was homeless and struggling with alcoholism. *See* Letter of Troy Caraway, Ex. 1 at 1. Mr. Kent later paid for Mr. Caraway to start his own business. In his letter to the Court, Mr. Caraway tells how Mr. Kent's friendship and charity provided a stable environment for Mr. Caraway and his two sons. Others,

such as the pastor of Mr. Kent's church, tell how Mr. Kent devotes time to feeding the hungry and is active in the church's mission and charity. *See* Letter of Rhett Ansley, Ex. 1 at 6. The conduct Mr. Kent engaged in that led to his prosecution was an extreme aberration from how he has otherwise conducted his personal and professional life. When the entirety of Mr. Kent's life and his character are considered, he unquestionably provides a significant benefit to society.

Mr. Kent is 42 years of age. He lives with his family in Houston, Texas. He and his wife, Casey Lynn, met in college, were married on June 12, 1998, and have enjoyed a long and stable marriage. They have three children, a 15 year-old boy, a 12 year-old girl, and an 11 year-old girl. Despite incredible stress caused by Mr. Kent's arrest, his wife and children love him as they always have and support him without qualification. Mr. Kent's daily, up-close view of the stress and unhappiness that his actions have caused the people he loves most, by itself, will provide all the deterrence needed to assure that he will never repeat the mistakes he made in this case.

Finally, with respect to the nature of the offense, and recognizing that Mr. Kent agreed to a significant loss amount that he is not backing away from,[1] depositions that were recently obtained from the related civil case brought by the complainant DHI Group, Inc. ("DHI"), show that DHI made little effort to determine its actual losses. The depositions detail that there was no deprivation of property, no computer system that was lost or destroyed, and that no customers left DHI because of Mr. Kent's conduct. Importantly, the depositions also show that, in retaliation for Mr. Kent's conduct, DHI engaged in significant unauthorized access against Mr. Kent's company. DHI then hid that conduct from the government at the same time it was cooperating with them to prosecute Mr. Kent. Finally, it is overlooked in the PSR that Mr. Kent's "sales pitch" to DHI in January of 2016 focused on the software he developed, not the number of

---

[1]    Indeed, Mr. Kent is presently making the arrangements necessary to effectuate the full amount of the restitution on or before the sentencing date of September 29, 2017.

users that Oilpro had. For these reasons, and others developed below, a sentence significantly below the guideline calculation is "sufficient, but not greater than necessary" to meet the purposes of sentencing.

**Factors that support a sentence outside the advisory guideline range.**

A number of important considerations under § 3553(a) support a sentence outside the advisory guideline range. These considerations are discussed in detail below.



---

2    *See* PSR Addendum, Sentencing Recommendation, at 31-33 ▮▮▮▮▮▮▮▮▮▮▮▮.

3    *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) ("in formulating a reasonable sentence a sentencing judge must consider 'the history and characteristics of the defendant' within the meaning of 18 U.S.C. § 3553(a)(1), . . . and should take under advisement any related arguments, including the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1.")







## II.    Mr. Kent's personal history and characteristics.

### A.    Mr. Kent's exceptional personal, professional, and charitable background reveals his true nature.

The difficult challenge for a sentencing judge is to individually consider every person and craft a punishment that fits the offender, not merely the crime.[7] This requires "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[8] Here, such a study negates any purported need for a guideline sentence.

---

[4]    *See* Sent. Tr. Forbes at 20:4-9, Ex. 2.

[5]    *United States v. Forbes*, Case No. 1:17-CR-259 (SDNY). (Doc. No. 28 at 3).

[6]    

[7]    *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011).

[8]    *Koon v. United States*, 518 U.S. 81, 113 (1996).

Mr. Kent was born in 1975 in Houston, Texas. His family was working class and certainly never wealthy, but his childhood was happy and his needs were provided for. His father worked on offshore oil rigs, and his mother stayed at home and cared for Mr. Kent and his two brothers.

Mr. Kent received an undergraduate degree at Southern Methodist University ("SMU"), in Dallas in 1998. He received a Bachelor of Arts in management information systems. At the end of his freshman year, Mr. Kent met Casey, his future wife. *See* Letter of Casey Kent, Ex. 1 at 2. The couple was engaged while still at SMU and married soon after graduation. They have been together ever since and are now parents to three wonderful children.

In college, Mr. Kent volunteered hundreds of hours to charitable work. His college roommate, Jeff Zickefoose, explains: "When most of us were sleeping in on weekends, Dave was up doing Habitat for Humanity or hanging with his little brother from Big Brothers Big Sisters of America."[9] Mr. Kent devoted many weekends to constructing homes with Habitat for Humanity, a charitable cause he is still passionate about. At Big Brothers and Big Sisters of America, Mr. Kent was a big brother for a child named Daniel, whose father abandoned him at a young age. Mr. Kent took Daniel to basketball games, amusement parks, and restaurants. As a result, Daniel's grades and social interaction with others improved.

After college, Mr. Kent went to work with his father at Rigzone, which, at that point, was a start-up news and job board website for professionals in the oil and gas industry. Mr. Kent became president and owner of the company. And under his stewardship, Rigzone expanded and became extremely successful. In 2010, Mr. Kent sold Rigzone to DHI.

---

[9]     Letter of Jeff Zickefoos, Ex. 1 at 9.

The sale of Rigzone made Mr. Kent wealthy, but he never lost his charitable nature. After selling the company, Mr. Kent and his wife donated the cost of an entire house to Habitat for Humanity. Mr. Kent's contribution meant that a young woman, Mary Burton, and her family received a home. The photograph below was taken at ribbon cutting for the house. Mr. Kent is on the right with his wife and children and Ms. Burton is on the left with her three young children.



In 2013, when the non-compete agreement between Mr. Kent and DHI expired, Mr. Kent started a new business, Oilpro. Through Oilpro, Mr. Kent sought to develop and bring to maturity a new kind of software platform suitable for industry networking uses in the oil and gas field. While he was developing Oilpro, Mr. Kent committed the acts that led to the criminal charges against him. As a direct result of his criminal prosecution, Mr. Kent closed Oilpro this year, sustaining a loss of over $6 million of his personal investment.

Though Mr. Kent committed serious mistakes, the many character letters speak volumes to his reputation as an honest, ethical, and kind entrepreneur who has employed dozens of people and helped them succeed. *See* Letter of Keith Flak, Ex. 1 at 14 ("seemed to find success in doing the right things"); Letter of Tiffany Neal, Ex. 1 at 23 ("made me feel important and part of the team . . . the business owner and company I could stay with until my retirement"); Letter of Brad Caruso, Ex. 1 at 22 ("an inspiration to employees").

The letters discuss Mr. Kent's genuine remorse, his acceptance of responsibility, and the pain he has already suffered from his illegal conduct. Letter of Keith Flak, Ex. 1 at 14 (understands "how his crimes have affected him, his loved ones, and most importantly his victims"); Letter of Tracey Santor, Ex. 1 at 15 ("taken ownership of the grief he has brought"); Letter of Beverly Kent, Ex. 1 at 4 ("thoroughly regrets his actions"); Letter of Rhett Ansley, Ex. 1 at 6 ("repented of this act and expressed his desire to grow in faith and service").

But they also present true insight, from those who know Mr. Kent best, that these were mistakes that Mr. Kent will never repeat. Letter of Mike Miller, Ex. 1 at 21 ("his first and last crime"); Letter of Jeff Zickefoose, Ex. 1 at 10 ("lapse of judgment"); Letter of Alice Kent, Ex. 1 at 18 ("criminal behavior is not indicative of his character").

Another point that speaks volumes to Mr. Kent's character is that, throughout all his success, his charitable nature has never waned. As in college, when he volunteered for Big Brothers and Big Sisters, or as when he donated a home to a family with three young children after the sale of Rigzone, Mr. Kent still has great compassion and concern for children in need. He financially contributes to Compassion International. Through that organization, Mr. Kent and his family sponsor Camilo, a child in Colombia. Kent's monthly donations pay for food and school supplies for Camilo.



Mr. Kent and his family are also deeply involved in their church, Wildwood United Methodist. Mr. Kent volunteers at the church's food pantry, where he transports food, stocks shelves, and delivers meals to people in need. *See* Letter of Rehtt Ansley, Ex. 1 at 6. Most recently, Mr. Kent volunteered dozens of hours helping victims of Hurricane Harvey in the Houston area. *Id.* After the storm, Mr. Kent built beds at a local church and high school. *Id.* And he worked to organize crews to tear down and remove contaminated sheet rock, insulation, and flooring from flooded homes. *Id.* As the pastor of Mr. Kent's church writes: "his family, church, and community are better off when he is an active contributor." *Id.*

But no one speaks more clearly to Mr. Kent's charitable nature than Troy Caraway. *See* Letter of Troy Caraway, Ex. 1 at 1. Mr. Caraway met Mr. Kent in Alcoholics Anonymous and witnessed Mr. Kent's recovery. *Id.* Due to alcoholism, Mr. Caraway struggled with housing and

10

to support his children. At one point, Mr. Caraway was homeless living in a tent, then a motorhome, and finally an apartment. One day, in an incredible act of friendship—and out of the blue—Mr. Kent purchased a home for Mr. Caraway. *Id.* At first, Mr. Caraway couldn't believe it, but it was real. *Id.* The home is only five minutes from where Mr. Caraway's two sons live with their mother and, because of the proximity, Mr. Caraway gets to see his children often and plays an active role in their lives.

Mr. Kent stepped up for his friend Mr. Caraway again when Mr. Caraway was laid off from his job. Mr. Kent paid for Mr. Caraway to start his own pest control business, which is successful today and allows Mr. Caraway to earn a living. *Id.* Other examples of Mr. Kent's charity appear throughout the character letters. But Mr. Caraway best sums up the Supreme Court's mandate from *Pepper* to sentence the offender and not merely the crime[10]: "Bad choices don't always make the person. Sometimes we just lose ourselves and our way." Letter of Troy Caraway, Ex. 1 at 1.

Mr. Kent lost his way when he committed this offense. But his true character is exhibited in his charity to people like Mr. Caraway, Daniel, Camilo, Ms. Burton, and the many other people he has touched and positively affected throughout his life. It is further exhibited in his commitment to his own three children. This all warrants strong consideration in reaching an appropriate sentence.[11]

---

[10]     131 S. Ct. at 1239-40.

[11]     *See United States v. Tomko*, 562 F.3d 558, 572-74 (10th Cir. 2009) (en banc) (downward variance to non-confinement sentence in white-collar case based largely on charitable works); *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (defendant's charitable work mentoring four high school students was "extraordinary" to a degree that justified a downward departure of 4-levels, not just a downward variance.).

**B.       Mr. Kent is a caring and loving father and husband.**

As stated above, Mr. Kent married his wife, Casey Lynn, on June 12, 1998. The couple has three children. Mr. Kent has provided for his family both financially and, more importantly, emotionally. Mr. Kent's children and wife were sleeping at home in the early morning hours of March 30, 2016, when FBI agents stormed their home to execute a no-knock arrest warrant. In addition to experiencing true terror, the children saw their father being arrested and handcuffed. This, along with the ever present fear that Mr. Kent will miss many of the children's formative years, has taken an understandable toll on the Kent family. Mr. Kent's wife has been diagnosed with depression and posttraumatic stress syndrome. Raising the family's three children without the presence and support of Mr. Kent would take a further toll on her mental and emotional health.

Mr. Kent is a positive and necessary influence in his children's lives. Mr. Kent's 15 year-old son is his oldest child and has struggled with grades since elementary school. Mr. Kent literally works every day with his son, striving to reach his full potential. They work together on homework and Mr. Kent recently worked with his son's school to get him enrolled in a special program that allows more time for tests and studying. Mr. Kent's son is also active in the rowing crew at school, and Mr. Kent takes him to practices and attends parent meetings.

Mr. Kent also provides daily academic oversight for his second oldest, a 12 year-old girl. Mr. Kent loves all his children equally, but finds himself talking with her for hours because of their similar temperaments. This child loves music. She sings and has recently begun to write her own songs.

Mr. Kent's youngest is an eleven year-old girl. She is perhaps the most timid of his three children, but she is also the best student. Mr. Kent loves to play basketball with her. And as with his other children, Mr. Kent takes her to the movies, on walks with their dogs, and swimming.

As the PSR shows, Mr. Kent's children are suffering from anxiety and depression from their father's legal predicament. In a fair system of justice—one that aims to make society a better and safer place—we cannot ignore the Kent children and the impact any sentence of confinement will have on them. A guideline range sentence, would mean that Mr. Kent's son would graduate high school without his father's presence. And Mr. Kent's two daughters would complete middle school and be well into high school by the time he is released. All three children would spend the bulk of their formative years without the influence of their father. Mr. Kent accepts that he is solely responsible for this situation, but the undeniable fact is that a prison sentence will have profound impact on these children and their chances of leading productive lives.[12]

Mr. Kent is well aware of the impact that incarceration would have on his children. It is the most difficult thing about this case for him. But Mr. Kent's need to be present for his children and their need for him, is all the deterrence needed to assure that he will never reoffend.[13] Given

---

[12]     "Removing a mother or father from a child's life is a not mere 'side effect' of the day's procedure; it is an 'effect,' often the most important thing that will happen that day." *Children deserve legal standing when parents are sentenced*, The Clemency Project. *Available at*, http://clemencyreport.org/rights-children-nowhere-stand/. "A growing body of research suggests that one of the most pernicious effects of high adult-incarceration rates can be seen in the struggles of children . . . who often lose a crucial source of motivation and support with their parents behind bars." Reckdahl, Katy, *Mass Incarceration's Collateral Damage: The Children Left Behind*, THE NATION, (Dec. 2014). Research is confirming what has been common knowledge for decades: "having a parent in prison makes it difficult—and sometimes impossible—to survive childhood's emotional roller coaster intact." *Id.*

[13]     *See United States v. Olis*, 2006 WL 2716048 at *13 (S.D. Tex. Sept. 22, 2006) (unpublished) (granting significant downward variance where the "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct."); *United States v. Marsh*, 820 F.Supp.2d 320, 379 (EDNY 2011) (three month sentence in fraud offense where guideline range was 121 to 151 months, noting that "the family will suffer financially during [defendant's] absence."); *United*

13

that Mr. Kent is a first time offender who will not reoffend, the profoundly negative impact that his incarceration will have on his children strongly weights against the need for a prolonged prison sentence.

      **C.**      **Mr. Kent's struggle with alcoholism.**

The PSR describes Mr. Kent's history of attending alcohol treatment from as far back as 2006. Mr. Kent has recognized this problem and has taken an active role in Alcoholics Anonymous. As Mr. Caraway explains in his letter, Mr. Kent has sponsored numerous individuals through AA, many of whom remain sober to this day. *See* Letter of Troy Caraway, Ex. 1 at 1 ("began sponsoring others and became a real asset in our group"). Being a sponsor means being available 24/7 to counsel and help individuals when they are going through difficulty or perhaps on the verge of relapse.

In addition to continued AA classes and treatment, Mr. Kent has been seeing psychiatrist Dr. Harvey Rosenstock to actively treat his addiction, which is detailed in the PSR. Mr. Kent would most benefit from continued treatment with Dr. Rosenstock sooner rather than later, which also cuts against the need for a prolonged sentence of imprisonment.[14]

**III.**      **The nature and circumstances of the offense.**

      **A.**      **Mr. Kent immediately accepted responsibility for his illegal conduct.**

As the Court is aware, a defendant's acceptance of responsibility and acknowledgement of wrongdoing is often the most difficult and perhaps the most important step to atoning for the

---

*States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (endorsing downward variance based in part on defendant being a "devoted husband, father, and son").

[14]    *See United States v. Duhon*, 541 F.3d 391, 399 (5th Cir. 2008) (variance to probation where court found defendant would most benefit from continued mental health treatment with his doctor of choice).

illegal conduct and the defendant's rehabilitation. Mr. Kent immediately confessed when questioned by the FBI. He was apologetic, remorseful, and admitted to wrong doing.

Mr. Kent not only admitted his illegal conduct to the FBI, as the character letters show, he has disclosed it to his closest friends, family, and peers. *See* Letter of Keith Flak, Ex. 1 at 14 ("saw first-hand his acknowledgement of his mistakes"); Letter of Mike Miller, Ex. 1 at 21 ("has true remorse"); Letter of Beverly Kent, Ex. 1 at 4 ("thoroughly regrets his actions"); Letter of Jeff Zickefoos, Ex. 1 at 9 ("immediately said that he made a mistake").

He has continued to accept responsibility for his conduct. As mentioned above, Mr. Kent recently decided to close Oilpro and permanently leave the social media business. In doing so, Mr. Kent lost approximately $6.1 million of his personal investment. While Mr. Kent could have continued operating Oilpro, he decided not to for a number or reasons. The primary reason was so that the Court can be assured that he is not a threat to reoffend or engage in conduct similar to what he did in this case. As Mr. Kent explained at his plea hearing, he engaged in unauthorized access into the Rigzone database so that his company could gain. Without Oilpro, Mr. Kent will not be motivated to engage in such conduct again. This, in addition to many other factors, establishes that Mr. Kent is not a threat to reoffend. And this, along with Mr. Kent's extraordinary acceptance of responsibility, warrants strong consideration for a downward variance.[15]

---

[15]   *United States v. Stall*, 581 F.3d 276, 285 (6th Cir. 2009) (upholding sentence to supervised release where guidelines recommended 57 to 71 months of imprisonment citing "immediate and unconditional expression of remorse"); *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (upholding downward variance where defendant was "remorseful at sentencing."); *United States v. Urbana*, 2009 WL 565485 at *3 (E.D. Wis. March 5, 2009) (unpublished) (downward variance where defendant "expressed a desire to better himself.").

**B.      Mr. Kent did not download or maintain any sensitive information, he did not attempt to personally harm any individual, and DHI engaged in "unauthorized access" against Mr. Kent's company.**

In early 2014, after he started Oilpro and was already growing that business, Mr. Kent committed this offense by improperly accessing Rigzone's computer systems and obtaining resumes of people seeking employment on Rigzone. Mr. Kent and others who worked at Oilpro then reached out to some of those individuals and solicited them to join the Oilpro website as an additional resource to find employment. A percentage of those individuals eventually did so.

In 2015, Mr. Kent learned that Rigzone invaded Oilpro's computer systems and taken information from a larger number of Oilpro subscribers than he had taken from Rigzone. Indeed, in depositions earlier this year, Mike Durney, the CEO of DHI, which is Rigzone's parent company, admitted to this unauthorized access of Oilpro's computer systems when DHI "scraped"[16] Oilpro:

> Q.      Do you admit that DHI has scraped data from the Oilpro website?
>
> A.      We have.[17]

Mr. Durney further admitted that DHI *profited* from such scraping.[18] Princepreet Chana, another DHI representative, confirmed that he led a DHI team that scraped Oilpro.[19] Chana admitted the

---

[16]      "Scraping" is the taking of information from a website and downloading it to the user's computer. *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 60 (1st Cir. 2003). Parties have been successfully sued under the CFAA for unauthorized scraping. *See e.g. Southwest Airlines v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439-40 (N.D. Tex. 2004); *QVC, Inc. v. Resultly*, LLC, 159 F. Supp. 3d 576, 596-97 (E.D. Pa. 2016) (and reviewing numerous similar examples).

[17]      Durney Depo. Excerpt at 61:6-8, Ex. 3.

[18]      Durney Depo. at 63:19 – 64:8, Ex. 3.

[19]      Chana Depo. at 25:2-19, Ex. 4. (Note, redactions to the transcripts were made at the insistence of DHI Group.)

scraping was done without Oilpro's permission and in violation of Oilpro's terms of use.[20] Because Oilpro's terms of service prohibited "scraping," DHI's actions were likely "unauthorized" in violation of the same statute Mr. Kent pleaded to, 18 U.S.C. § 1030(a)(2)(C).

Importantly, Mr. Durney admitted that DHI concealed its scraping of Oilpro from the government at the same time it was cooperating to prosecute Mr. Kent.[21] To be clear, Mr. Kent has and does accept responsibility for his unlawful actions against Rigzone. But it is significant that DHI, in causing the government to initiate its investigation into Mr. Kent, failed to disclose its own similar misconduct directed at Oilpro.

When Mr. Kent learned of this Rigzone intrusion in 2015, he foolishly reacted by downloading additional resumes from Rigzone. Mr. Kent took the bulk of the resumes involved in this offense during this second intrusion.[22] Again, he copied the resumes of a large number of Rigzone's members. As before, Oilpro reached out to a small percentage of those individuals, and a portion of the persons contacted eventually joined Oilpro while simultaneously maintaining their affiliation with Rigzone.

Mr. Kent accessed approximately 796,000 Rigzone members' accounts, which contained approximately 586,560 unique email addresses.[23] Approximately 17.7% of those email addresses were later invited to join Oilpro, and approximately 35.7% of the individuals invited to join did in fact join.[24] In total, approximately 111,000 Rigzone members whose email addresses were

---

[20]    Chana Depo. at 113:18 – 114:2, Ex. 4.

[21]    Durney Depo. at 149:6 – 150:5, Ex. 3.

[22]    PSR (Doc. No. 46) ¶ 38.

[23]    PSR ¶ 45.

[24]    *Id.*

obtained improperly by Mr. Kent became members of Oilpro.[25] However, as explained in the Revised PSR, the government agrees "that there is no proof or indication that all 111,000 new Oilpro members joined based on Kent's activities."[26] And certainly, some joined independently of Mr. Kent's conduct, just as many people maintain more than one online social media or professional networking profile. The exact number of users that Oilpro gained as a result of Mr. Kent's actions remains unknown.

Later in 2015, Mr. Kent sought to place a valuation on Oilpro. Among other companies, he contacted DHI to gauge their interest in making an offer for his business that would aid him in reaching a valuation. DHI, however, was already aware of his intrusions and had contacted the government. Working with the FBI, DHI responded to Mr. Kent's outreach by engaging in a lengthy telephone conversation with him and encouraging Mr. Kent to attend a business meeting in New York City to discuss his interest in selling Oilpro.

In these recorded conversations, which were produced in discovery, Mr. Kent focused on the qualities of Oilpro's software platform. For example, he stressed how it could be adapted to other industries that DHI operated in, and that it would complement Rigzone's business. The DHI participants repeatedly tried to steer the conversation to the number of members Oilpro had and how they were acquired. Mr. Kent answered those questions in a way that omitted his wrongful conduct, but he consistently sought to focus on his proprietary software system, not Oilpro's subscriber constituents.

The reality is that Rigzone and Oilpro were two competitors working to advantage themselves in a competitive environment. This was the defining scope and the motivation for Mr.

---

[25]    *Id.*

[26]    PSR at p. 29. *See also*, PSR ¶ 45.

Kent. While Mr. Kent's conduct was unquestionably wrong, he did not take confidential personal information from Rigzone users, and did not harm any individual financially. He did not keep sensitive information about the individuals. Rather, he improperly obtained their otherwise publicly-available information and used their email address to solicit a fraction of them to join Oilpro. This is different from cases involving a perpetrator who harms individuals financially, steals identities, or blackmails people. Such cases—involving financial harm to individuals or theft of private information—are reviewed in the "avoiding unwarranted disparities" section below. Many defendants in such cases received sentences significantly below what Mr. Kent faces under the advisory guideline calculation here. This too deserves consideration in the "nature and circumstances of the offense."

**C.      New evidence suggests that DHI's actual loss is minimal.**

In the Plea Agreement, Mr. Kent agreed: (1) to a loss amount in excess of $1,500,000 but less than $3,500,000, (2) to forfeit $2,932,800, and (3) to make restitution of $3,393,800. Mr. Kent does not dispute the loss amount for purposes of sentencing, and he intends to pay both the forfeiture and the restitution amounts at or before sentencing.

Since the plea agreement was entered, DHI representatives have been deposed in relation to the civil lawsuit DHI brought against Mr. Kent in the U.S. District Court for the Southern District of Texas. This newly discovered evidence is important in recognizing that any actual financial loss suffered by DHI is questionable and is specifically relevant to the Court's consideration of the proper sentence for Mr. Kent.

In the civil case, Mr. Durney, the CEO of DHI, testified that DHI has not identified a single customer, job seeker, candidate or member it lost because of Mr. Kent's actions.[27] He and

---

[27]      Durney Depo. at 86:9-23, Ex. 3.

other corporate representatives, such as Jason Braddy, confirmed that no DHI data or property was destroyed, corrupted, diminished, or deleted by Mr. Kent's actions.[28] There was no decrease or change in the completeness or the usability of data on any Rigzone computer system.[29] DHI has conducted no analysis as to whether there was any decline in business because of this activity.[30] It never assessed the value of the email addresses for the resumes that were accessed by Mr. Kent.[31] The deposition testimony makes clear that there were no damages incurred to DHI's property or customer base as a result of the data breaches.

Mr. Durney also testified he had no idea what DHI's costs of remediation were and that he had never been told this information.[32] He never discussed remediation costs with anyone at DHI, including Constance Melrose, who was apparently in charge of determining such costs.[33] And Mr. Durney further denied any discussions with the FBI or the DOJ about remediation costs or loss.[34]

Then, when presented with DHI's compilation of remediation costs claiming Mr. Durney spent 40 hours at a cost of $67,000 correcting damage from Mr. Kent's conduct, Mr. Durney responded that he never provided an estimate of his hours and, in fact, that he did not track the time he worked on this issue.[35] So it appears that any remediation expenses attributed to time spent by Mr. Durney were poorly estimated and potentially inaccurate.

---

[28]     Durney Depo. at 82:14 – 84:17, Ex. 3; Braddy Depo. at 27:15-19, 44:22 – 45:20, Ex. 5. (Note, redactions to the transcripts were made at the insistence of DHI Group.)

[29]     Durney Depo. at 83:24 – 84:9, Ex. 3.

[30]     Durney Depo. at 101:2-8; 107:14-23, Ex. 3.

[31]     Durney Depo. at 137:25-138:10; 140:14-20, Ex. 3.

[32]     Durney Depo. at 119:7-22, Ex. 3.

[33]     Durney Depo. at 120:14 – 121:4, Ex. 3.

[34]     Durney Depo. at 121:5-9, Ex. 3.

[35]     Durney Depo. at 186:12-187:2, Ex. 3.

DHI never advised its shareholders that there was any decline in its value due to Mr. Kent's conduct.[36] Instead, DHI represented to shareholders that its decline in value during the time relevant to this case was due to a general oil market decline.[37]

In the absence of evidence from DHI showing it incurred any actual loss associated with a decline in value, any loss suffered could only be based on the value of resumes that Mr. Kent accessed. But on this point, Mr. Durney explained that when DHI acquired Rigzone, the purchase price was determined based on monetizing the customers and on discounted cash flow.[38] It was not, in other words, based on any valuation of the Rigzone resumes—either by a specific value per resume, or by an aggregate value of the resume database.[39] Mr. Durney explained that, with the potential exception to one minor acquisition, DHI has *never* determined the purchase price for any acquisition or divestiture based on valuing resume data.[40]

Mr. Durney's deposition establishes that DHI has never valued a company based on resumes. This is simply not a reasonable metric of fair market value or loss, and the fact that DHI appears to have presented this method of valuation as loss, we believe, raises serious concern. Again, these issues are not raised in any way to reject or contest the calculations previously agreed to by Mr. Kent in the Plea Agreement. Rather, they are brought to the Court's attention to underline the reality that "actual loss" suffered by the victim in this case are distinctly separate from what was previously agreed to without the benefit of the civil discovery.

---

[36]     Durney Depo. at 98:10-15; 100:3-7, Ex. 3.

[37]     Durney Depo. at 107:24-108:22, Ex. 3; Melrose Depo. at 147:12-21, Ex. 6.

[38]     Durney Depo. at 165:22 – 166:23, Ex. 3.

[39]     *Id.*

[40]     Durney Depo. at 166:24 – 167:13-25, Ex. 3.

IV.     **The purposes of sentencing – 18 U.S.C. § 3553(a)(2).**

The goal of sentencing is to impose a sentence that is "sufficient, but not greater than necessary" in light of the sentencing goals of retribution, deterrence, protecting the public, and rehabilitation. 18 U.S.C. § 3553(a)(2).

   A.     **Seriousness of the offense, respect for the law, and just punishment.**

Mr. Kent absolutely recognizes that he committed a serious offense. But excessive punishment, like insufficient punishment, can diminish respect for the law.[41] And there is "no legitimate reason" for punishment "solely for the sake of punishment."[42] As the Supreme Court declared as long ago as 1949, "[r]etribution is no longer the dominant objective of the criminal law."[43] Given the facts and circumstances of this case, a variance from the advisory guideline range is appropriate. There is nothing that society will gain by having Kent incarcerated for an extended period of time. He is capable of working legitimately, providing for his family, and being a productive citizen. Upon weighing all factors, a substantial variance is more than appropriate.

   B.     **Achieving deterrence, rehabilitation, and assuring Kent does not reoffend.**

Achieving deterrence is obviously an important sentencing goal, but a guideline range sentence is not necessary to meet that goal. Nothing in § 3553(a) "require[s] the goal of deterrence be met through a period of incarceration."[44] And "there is no decisive evidence to

---

[41]   *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.")

[42]   *Magluta v. Samples*, 375 F.3d 1269, 1276 (11th Cir. 2004).

[43]   *Williams v. People of State of NY*, 337 U.S. 241, 248 (1949).

[44]   *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010).

support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white collar offenders."[45] Deterrence and rehabilitation have become paramount goals of sentencing, especially for non-violent offenders like Mr. Kent. These objectives will not be served by a guideline range sentence or anything close thereto.

First, Mr. Kent is not a threat to reoffend. This was a one-time sequence of bad choices and Mr. Kent has now closed Oilpro. Mr. Kent will not operate another professional networking website, so there is no threat that he will engage in similar conduct. Mr. Kent hopes to work full-time at his church in the Family Assistance and Ministries Department. In this role, he can serve the less fortunate, focus on families, and lead a new life of service. Second, Mr. Kent's "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct."[46] Mr. Kent's need to be present for his wife and children, along with his knowledge that the slightest error could result in his serving significant time in prison, provides assurance that he will not reoffend if this Court sees fit grant a significant downward variance.

The Supreme Court recently held in *Tapia* that "a court may not impose or lengthen a prison sentence . . . to promote rehabilitation."[47] And *Tapia's* core reasoning, that prison time does not rehabilitate, is borne out by the Sentencing Commission's most recent and most comprehensive study on recidivism. A few points from the study are pertinent. First, the Commission found that among 25,431 offenders—the largest group of any prior Commission

---

[45]     Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007).

[46]     *United States v. Olis*, 2006 WL 2716048 at *13 (S.D. Tex. Sept. 22, 2006) (varying downward over 50% from guideline range).

[47]     *Tapia v. United States*, 564 U.S. 319, 335 (2011).

study—those "with shorter lengths of imprisonment generally had lower recidivism rates."[48] Of the offenders sentenced to prison, the group with the lowest rate of recidivism (37.5%) served less than six months incarceration.[49] And those who received probationary sentences had an even lower rate of 35.1%.[50] And while one could argue that such individuals received lower sentences and, therefore, were more likely to be first-time offenders, that too is the case with Mr. Kent.

The study further shows that Mr. Kent, as a 42-year-old with a college education, is among a category of individuals statistically with a very low likelihood to recidivate. The study found that individuals with a college education recidivated at 19.1%, which is much lower than the average rate.[51] Add to this Mr. Kent's history of good works, his established community support, and his need to support his family, and we have a person with an incredibly small likelihood of reoffending. Significant prison time will not serve the goals of deterrence and rehabilitation.

The best way to achieve deterrence and assure Mr. Kent does not reoffend is to monitor Mr. Kent closely outside of prison and ensure he continues down his path of treatment and rehabilitation. Imposing the shock of a short prison sentence or home confinement with subsequent supervised release—i.e., closely monitoring Mr. Kent after implanting the reality that, if he is unsuccessful, he will serve significant time in prison—will effectively achieve deterrence and rehabilitation. This will allow Mr. Kent to continue down the path of

---

[48]     U.S. Sentencing Commission. *Recidivism Among Federal Offenders: A Comprehensive Overview* at 22, *available at*, http://www.ussc.gov/research/research-publications/recidivism-among-federal-offenders-comprehensive-overview.

[49]     *Id.* at 5, 22.

[50]     *Id.* at 5.

[51]     *Id.* at 24.

rehabilitation that he has already begun. And Mr. Kent's personal situation shows that he poses

no further risk to the public. We should not waste prison space on him.

## V.    The sentencing guidelines – § 3553(a)(4).

Relying on the guidelines as a basis for a rational sentence is increasingly questioned as

they cannot be presumed reasonable.[52] The parties have agreed to a 16-level increase for the loss

figure pursuant to U.S.S.G. § 2B1.1(b)(1). But Mr. Kent retained the right to argue that the

guideline level, based largely on the 16-level increase, is too harsh.

Given the nature and circumstances of losses in this particular case, the § 2B1.1 loss

figure is an inadequate measure of the seriousness of the offense. First, § 2B1.1 losses in CFAA

cases are driven largely by what the complainant claims as remediation costs.[53] And while this

perhaps makes sense for restitution purposes, where actual loss governs, it can lead to unfair

results with the guideline calculation. One example is seen in the case of Kevin Forbes, who Mr.

Kent assisted the government in prosecuting. Mr. Forbes accessed approximately one million

resumes while Mr. Kent's accessed 800,000 Rigzone accounts, from which he obtained

approximately 586,560 email addresses.[54] Yet, despite Mr. Forbes's actions and intent being

more egregious, the agreed § 2B1.1 loss in Mr. Forbes's case was approximately $559,000,

while Mr. Kent faces losses over $1.5 million.[55] So Mr. Forbes, who accessed more resumes and

data than Mr. Kent, faced a lower advisory guideline sentence simply because his victim more

---

[52]      *Nelson v. United States*, 555 U.S. 350, 352 (2009).

[53]      *See* U.S.S.G. § 2B1.1 cmt. n. 3(A)(v)(III) (stating that loss includes remediation costs in CFAA cases).

[54]      *Compare* Sent. Tr. Forbes, Ex. 2 at 6:7-9 (government stating Mr. Forbes accessed "somewhere in about the range of a million resumes"), *with*, PSR ¶ 45 (showing Mr. Kent accessed approximately 796,000 accounts, not necessarily resumes).

[55]      *Compare* Sent Tr. Forbes, Ex. 2 at 9:5-6 ("stipulated loss" of $559,000), *with*, PSR ¶ 71.

efficiently remediated damages. In our view, this makes the loss figure an ineffective tool in reaching a just sentence for Mr. Kent.

Importantly and as stated above, DHI was unable to identify any actual destruction, corruption, or lost value of its property from Mr. Kent's actions.[56] There was no decrease or change in the completeness or the usability of data on any Rigzone computer system.[57] And there was never any interruption in service.[58] Although Mr. Kent is not backing off from the loss amount to which he agreed, given these unique circumstances, loss should not be the driving force behind the sentence. When factors ignored by § 2B1.1 are considered—the minimal, if any, harm to DHI's computer system, Mr. Kent's charitable works, his support structure, and his taking of personal responsibility along with his efforts to better himself—the loss figure appears to be an unreliable measure of reaching a just sentence, and a sentence far below the guideline range is sufficient.

## VI.    Avoiding unwarranted sentencing disparities between similar cases.

The concern for avoiding sentencing disparities requires the Court to consider disparities on a national scale.[59] But one similarly situated defendant is from this District: the case of Kevin Forbes. At Mr. Forbes's sentencing, Assistant United States Attorney Chan explained that Mr. Forbes's offense involved "somewhere in the range of a million resumes."[60] Meanwhile, the PSR here shows that Mr. Kent's offense involved access to 796,000 accounts, although 586,560 of the accounts contained email addresses and then only 17.7% of the email addresses were ultimately

---

[56]    Durney Depo. at 82:14 – 84:17, Ex. 3; Braddy Depo. at 27:15-19, 44:22 – 45:20, Ex. 5.

[57]    Durney Depo. at 83:24 – 84:9, Ex. 3.

[58]    Braddy Depo. at 44:22 to 45:20, Ex. 5; Melrose Depo. at 65:2-8, Ex. 6.

[59]    *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008).

[60]    Sent. Tr. Forbes, Ex. 2, at 6:7-9.

contacted.[61] Mr. Forbes's crime occurred on a global scale—he used individuals in India to download data and misappropriate information. Mr. Forbes's victim had to spend hundreds of thousands of dollars to remediate damages and fix its security system. As explained above, the victim in this case, DHI, was unable to explain its losses in any reliable or accurate manner during depositions.

Mr. Forbes was sentenced on August 30, 2017, to 18 months incarceration and, although it appears Mr. Forbes's offense involved access to more resumes than Mr. Kent's, his restitution order was substantially lower, at $559,729. Given the concern for avoiding unwarranted sentencing disparities, it is difficult to justify a greater sentence of incarceration for Mr. Kent.

Moreover, numerous cases throughout the nation have involved what we believe is worse conduct than Mr. Kent's, yet they resulted in sentences significantly below the advisory guideline range Mr. Kent faces. Some examples are:

- Jared Abrahams, who received 18 months in prison for hacking into 150 computers of college-age girls and controlling their web camera to take nude pictures of them. Mr. Abrahams then used the photos to extort his victims, threatening to publically distribute the pictures if they did not either send him more nude pictures or submit to a live video chat and perform sexual favors as he instructed.[62]

- Hunter Moore and Charles Evens were given two year sentences for operating a so-called "revenge porn" website. Moore paid Evens to hack into computers and gain unauthorized access to victims' email accounts, where Evens downloaded sexually explicit photographs of the victims. Moore would then post the stolen pictures on his website.[63]

---

[61]   PSR ¶ 45.

[62]   DOJ Press Release. *Temecula Student Sentenced To Federal Prison In 'Sextortion' Case.* (Mar. 17, 2014), *available at*, https://www.justice.gov/usao-cdca/pr/temecula-student-sentenced-federal-prison-sextortion-case.

[63]   FBI Press Release. *Operator of Revenge Pornography Website Sentenced to More Than Two Years in Federal Prison in E-Mail Hacking Scheme to Obtain Nude Photos* (Dec. 2, 2015), *available at*, https://www.fbi.gov/contact-us/field-offices/losangeles/news/press-releases/operator-of-revenge-pornography-website-sentenced-to-more-than-two-years-in-federal-prison-in-e-mail-hacking-scheme-to-obtain-nude-photos.

- Raynaldo Rivera and Cody Kretsinger received sentences of one year and one day and a $605,663 restitution order for hacking Sony Pictures Entertainment, which resulted in the personal information of more than 138,000 people being posted on the Internet. The distributed information included names, addresses, phone numbers, and email addresses. Both defendants, moreover, were members of a larger hacking organization with a global reach.[64] Kent did not publically distribute any of the information he obtained and no individuals' privacy was put at significant risk.

- Alexander Mihailovski and Mikael Sallnert were each sentenced to four years in prison for their role in a $71 million cybercrime scheme that infected victims' computers with false warnings that their computer had been infected with a virus, then sold them a fake anti-virus software. The scheme involved an estimated 960,000 victims and $71 million in actual losses.[65] Kent's crime did not involve this number of victims or financial harm to actual people.

- Abiodun Adejohn was sentenced to three years in prison for hacking and identity theft. Adejohn used "phishing" attacks with fake emails that mimicked email addresses of U.S. government agencies. He stole credentials of federal employees and placed orders for expensive office products through their names. He then resold the merchandise on the black market. In total his scheme defrauded vendors of almost $1 million.[66]

Turning back to this District, another similarly situated defendant is Galen Marsh. Mr. Marsh stole client information from his employer, Morgan Stanley, through approximately 6,000 unauthorized searches of the investment bank's computer system. He obtained highly confidential client information from approximately 730,000 client accounts, including names,

---

[64] DOJ Press Release. *Second Member Of Hacking Group Sentenced To Over Year In Prison For Stealing Customer Information From Sony Pictures Computers* (Aug. 8, 2013), *available at*, https://www.justice.gov/usao-cdca/pr/second-member-hacking-group-sentenced-over-year-prison-stealing-customer-information.

[65] DOJ Press Release. *Belarus Native Involved in Credit Card Processing 'Scareware' Scheme Sentenced to 4 Years in Prison* (Jan. 26, 2017), *available at*, https://www.justice.gov/usao-wdwa/pr/belarus-native-involved-credit-card-processing-scareware-scheme-sentenced-4-years.

[66] FBI Press Release. *Nigerian Man Sentenced to Three Years in Prison for Role in Computer Hacking Scheme That Targeted Government Employees.* (May 20, 2015), *available at*, https://www.fbi.gov/contact-us/field-offices/newark/news/press-releases/nigerian-man-sentenced-to-three-years-in-prison-for-role-in-computer-hacking-scheme-that-targeted-government-employees.

addresses, telephone numbers, account numbers, fixed-income investment information, and account values.[67] Mr. Kent misappropriated less information, and no individual's finances were put at risk. Mr. Marsh's received three years of probation and was ordered to pay $600,000 in restitution for violating the CFAA.

Recognizing this Court's broad discretion in reaching a reasonable sentence for Mr. Kent, it is noteworthy that in sentencing Mr. Marsh—who was also a time offender with a good educational and employment background—the judge warned: "God forbid you screw up once [on probation] . . . I will hit you with everything possible and make sure you spend your time in the worst place I can find."[68] Mr. Marsh, heeded the judge's warning. Review of his docket sheet confirms that Mr. Marsh has abided by his conditions of probation and has made significant restitution payments. The same sentence would work for Mr. Kent, if the Court sees fit. Such a sentence would deter any future criminal conduct and ensure Mr. Kent's continued rehabilitation while continuing to provide for his family.

### Conclusion

A guideline level prison sentence is not necessary to meet the goals of 18 U.S.C.

§ 3553(a). . It also appears to

---

[67]     FBI Press Release. *Former Morgan Stanley Financial Adviser Sentenced in Manhattan Federal Court for Illegally Accessing Confidential Client Information*, (Dec. 22, 2015), *available at,* https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/former-morgan-stanley-financial-adviser-sentenced-in-manhattan-federal-court-for-illegally-accessing-confidential-client-information.

[68]     REUTERS. *Ex-Morgan Stanley adviser spared U.S. prison term for taking data* (Dec. 22, 2015), *available at,* http://www.reuters.com/article/us-morgan-stanley-cybersecurity-crime/ex-morgan-stanley-adviser-spared-u-s-prison-term-for-taking-data-idUSKBN0U521Z20151222.

have not accounted for the full nature of the offense—including the loss issues and the fact that

DHI also engaged in unauthorized access against Mr. Kent ████████████████████

████████████ charitable history, his support system, and his lack of criminal history should all

assure the Court that he is not a threat to reoffend. A sentence below the recommendation of the

Probation Officer would be "sufficient, but not greater than necessary" in this unique case.

Respectfully submitted,

THE COGDELL LAW FIRM, PLLC

*/s/ Dan Cogdell*
Dan L. Cogdell
402 Main Street, 4th Floor
Houston, Texas 77002
Tel:    (713) 426-2244 (phone)
Fax:    (713) 426-2255 (facsimile)
Email:  dan@cogdell-law.com

SPEARS & IMES LLP

*/s/ David Spears*
David Spears
51 Madison Avenue
New York, New York 10010
Tel:    (212) 213-6991
Fax:    (212) 213-0849
Email:  dspears@spearsimes.com
