

DHI Group, Inc
www.dhigroupinc.com
1040 Avenue of the Americas, Floor 8
New York, NY 10018
212 725 6550

September 27, 2017

    Re:    *United States v. David Kent*, 16 cr 385 (DLC)
            Victim Impact Statement — DHI Group, Inc.

Honorable Judge Denise L. Cote
Southern District of New York
United States District Court
500 Pearl Street, Rm. 1040
New York, New York 10007

Dear Judge Cote:

        I am the General Counsel and Vice President of Business and Legal Affairs for DHI Group, Inc. and one of its subsidiaries, Rigzone.com, Inc. (together, "DHI") and write this Victim Impact Statement concerning defendant David Kent's ("Kent") criminal conduct and sentencing. As Vice President of Business and Legal Affairs, I have been responsible for many of the business activities impacted by Kent's illegal conduct.

        When we at DHI first learned that Kent was unlawfully hacking into our systems to steal confidential member information, we were stunned. Not only did DHI appoint Kent to continue as the President of Rigzone under DHI's ownership, most of DHI's senior leadership team viewed Kent as a colleague and well-respected member of the team and, to many, he was thought to be a friend. The revelation that Kent was repeatedly and intentionally stealing from us to injure or destroy DHI and Rigzone was in many ways beyond comprehension. However, as we came to learn the full extent of Kent's conduct and witnessed his post-arrest behavior, we have realized how truly wrong we were to have ever placed any trust in him whatsoever. The callous and unapologetic nature of Kent's response—evidenced by his continued efforts to harm our company and his civil litigation strategies of "no harm, no foul" and "blame the victim"—has made clear that he has no remorse or appreciation for the gravity or impropriety of his crimes or any respect for his victims.

        As the Court evaluates the appropriate sentence, DHI asks that the Court review the information set forth below and consider (i) the scope, duration, and repetitive nature of Kent's criminal scheme; (ii) the tremendous impact that Kent's crimes had on DHI; (iii) Kent's intent to defraud DHI using the very information that he had stolen from its systems; and (iv) Kent's failure to accept responsibility for the injuries he has caused or demonstrate remorse towards his victims.



DHI Group, Inc.
www.dhigroupinc.com
1040 Avenue of the Americas, Floor 8
New York, NY 10018
212.725.6550

### A. DHI buys Rigzone from Kent for $51 million, and Kent lays plans to compete with his former company immediately before his non-compete expires.

The backstory of Kent's crimes dates back to August 2010 when DHI acquired Rigzone from Kent for $51.7 million. Today, Rigzone is the leading website for online content, data, and career services in the oil and gas industry. The driver of Rigzone's website is its members database in which oil and gas professionals post resumes which can then be used by recruiters to search for candidates for job openings. The database is the central investment for Rigzone's business and requires significant investment to maintain engagement by the members and to ensure fresh candidates and growth.

Following Rigzone's sale to DHI, Kent remained with Rigzone as President until September 30, 2011, when he departed the company. Precisely two years later, at the first possible moment allowed under his non-compete, Kent launched a directly competitive website, Oilpro.com ("Oilpro"). Indeed, there was even a timer on the Oilpro website that counted down to the expiration of Kent's non-compete and the simultaneous launch of the Oilpro platform. Rigzone has been a direct competitor of Oilpro and provided a platform to engage oil and gas professionals, who have the ability to post resumes on its website, and to allow potential employers and recruiters to post job openings. Rather than spend the money and resources necessary to create a bona fide company, within weeks of Oilpro's launch, Kent was illegally and repeatedly accessing Rigzone's computer systems to steal member information and jumpstart Oilpro.

To access Rigzone's member database, Kent utilized a series of access points not displayed to the public. Only a person with intimate knowledge of Rigzone's systems and how Rigzone catalogued its resumes would have been able to submit the appropriate commands to take Rigzone's data. Kent had this intimate knowledge and used it to benefit Oilpro and himself repeatedly over a two-year period. This was not a momentary lapse of judgment.

### B. Kent stole more than 700,000 member profiles and resumes over two years.

Between October 2013 and April 2014, Kent unlawfully accessed and took approximately 100,000 Rigzone member profiles. He did it on numerous occasions, he did it using automated means, and he targeted the newest and most active Rigzone members. To that end, Kent took every resume profile created between October 4, 2013 and April 3, 2014—approximately 6,000 in October 2013, over 61,000 in February 2014, and over 35,000 in April 2014. Oilpro then took the names, experience, and contact information for those individuals and invited them to join Oilpro, resulting in an immediate spike in Oilpro's members database. For example, Oilpro only gained approximately 3,085 new members in December 2013, but new membership rose to over 12,000 in February 2014, over 28,000 in April 2014, and over 45,000 in June 2014.



DHI Group, Inc.
www.dhigroupinc.com
1040 Avenue of the Americas, Floor 8
New York, NY 10018
212 725 6550

In 2015, Kent was back at it, accessing information from approximately 700,000 resumes in Rigzone's members database in July and August 2015 and using that stolen information to solicit and convert Rigzone's members. And in December 2015, Kent tried to access Rigzone's members database yet again. By this time, however, the access points that Kent used to misappropriate DHI's information had been closed to prevent further extraction.

### C.   Kent Admits his Crimes to the FBI and Pleads Guilty

In Summer 2014, DHI informed federal authorities of its suspicions that its systems had been unlawfully accessed. Following a lengthy investigation, on March 30, 2016, the FBI raided Kent's home and Oilpro's offices.

On December 19, 2016, Kent pleaded guilty and testified in New York federal court that:

- "[B]eginning in October of 2013, I intentionally accessed without authorization the database of a website called Rigzone . . . And I took the resumes for my own commercial advantage to help my business Oilpro . . . By inviting people to join my site to increase the membership of Oilpro."

- His conduct began in "October 2013 to somewhere during the first quarter of 2014 and then in June of 2015 the second time."

- "[I]n the case of [DHI], the owner of Rigzone my intent was to try to get a market valuation for my company . . . the value of my company through gaining new members would have increase[d] the value of Oilpro to Rigzone."

### D.   Kent's criminal conduct caused tens of millions of dollars in damages.

Kent's crimes were part of a larger scheme to quickly grow and market Oilpro in order to achieve a quick payout. Seeking to leverage the member base and growth that Kent had secretly achieved through the unlawful theft of Rigzone's proprietary information, in April 2014— after Kent's initial round of hacks—Kent reached out to DHI about a potential purchase of Oilpro. Like Rigzone, the core value of Oilpro as a business lies in its members. And as Kent's marketing efforts continued into 2015, he represented to DHI's executives that Oilpro and its membership base had been valued by investors in 2014 (after the initial round of hacks) at approximately $20 million, implying that he would need to sell Oilpro for more than that amount to give those investors some reasonable return. Oilpro confirmed this valuation in its Second Amended Answer in the civil lawsuit less than a year ago, making clear that the actual value of the information stolen from DHI far exceeds the forfeiture amount entered here:



DHI Group, Inc.
www.dhigroupinc.com
1040 Avenue of the Americas, Floor 8
New York, NY 10018
212.725.6550

"[T]he value of the Oilpro website and the profiles of the Oilpro members exceeds $20 million."

Perhaps the best evidence of the value of what Kent stole from Rigzone, however, is Oilpro's own internal valuations of its members. As recently as last year, Oilpro's own internal business presentations valued each Oilpro member as being worth at least $100 and more likely $200. Even if that valuation were only applied to the more than 111,000 members that the Federal Bureau of Investigation's sworn complaint against Kent indicates Oilpro successfully converted using Rigzone's stolen information (*see U.S. v. David Kent*, 16 cr 385 (DLC), Dkt. 1, Crim. Compl. ¶ 25(f)), then the value of what Kent stole was more than $20 million. Thus, in both Kent's own admissions and in public court filings, the sum of what he stole exceeds $20 million.

Moreover, these figures do not even take into account the significant start-up costs that Kent avoided through the theft of DHI's proprietary information. Nor does it account for the additional marketing spend that would otherwise have been necessary to vet Oilpro candidates and nurture and keep the job seekers active. Rather than engage in these long-term and costly investments, Kent simply stole the fruits of DHI's investment and marketing spend.

Finally, in assessing the loss suffered by DHI, the Court should also look to the costs DHI incurred in responding to the breach of Rigzone's system. Those expenses include the costs of conducting an internal investigation and retaining a forensic expert to understand the extent of the data breach caused by Kent and his cohorts. The amount of those costs is estimated at over $403,000.[1]

### E. Kent's post-arrest conduct has demonstrated an unwavering lack of contrition for his crimes.

As the Court is aware, Kent has and undoubtedly will continue to express platitudes of responsibility and regret for his choices in an effort to minimize his sentence or avoid jail time altogether. During his plea hearing, for example, Kent acknowledged in open court that he stole "resumes for his own commercial advantage" and that he "understood that what [he was] doing was wrong." Kent's recent actions, however, contradict any notion that he is actually remorseful for his conduct or that his feigned claims of regret carry any weight.

While Kent has informed the authorities that he intends to take full responsibility for his actions and "make it right," his approach in the parallel civil proceeding paint a very different picture. Indeed, rather than make an effort to repair the harm he has caused, Kent instead has shirked any responsibility for the impact of his crimes, choosing instead to rely on frankly

---

[1] This Court should be aware that the $3,292,800 and $2,932,800 amounts agreed to by Kent in the restitution and forfeiture orders were the product of the Government's independent loss calculation. DHI cooperated with the Government in providing information about its business, and argued for a higher loss amount, but the Government, utilizing its own methodology, arrived at $3,292,800. To date, no restitution has been paid.



DHI Group, Inc
www.dhigroupinc.com
1040 Avenue of the Americas, Floor 8
New York, NY 10018
212 725 6550

despicable strategies of "no harm, no foul" and "blame the victim." Moreover, even after his arrest, Kent unapologetically wrote to Oilpro's investors that, in the end, DHI "w[ould] be the one shutting down," not Oilpro.

The parties recently were close to a complete resolution of the civil litigation pending in Texas—for an amount far in excess of the loss amount Kent now espouses and more than double the $3.2 million loss amount he agreed to with the government. But after an agreement in principle was reached, that resolution was made contingent on DHI affirmatively telling the government that the loss amount was only $120,000, presumably to obtain a reduction in Kent's sentence—something that DHI could not and would not do because it does not believe this to be true. When this came to light before the Houston federal district court, Kent was chastised in open court for, what the Honorable Judge Nancy Johnson characterized as "playing in [her] court over Kent's criminal problems," "trying to impeach" the criminal judgment and plea, and trying to "gain some sort of, you know, retraction or re-litigation on [Kent's] plea" in order to gain an advantage before the New York court. *See*, Transcript attached hereto as Exhibit A. Kent's gamesmanship is reflective of someone who only regrets being caught and is trying to minimize, if not avoid, the consequences of his misconduct, not someone who appreciates that what he did was wrong.

In his Sentencing Memorandum, Kent again refused to acknowledge the significance of his actions, attempting to equate his criminal conduct—in which he intentionally circumvented security measures to access Rigzone's member database—with DHI's accessing Oilpro's publicly-available data. Oilpro has acknowledged repeatedly that this data was available to anyone using Yahoo! or Google. Yet, Kent continues to blame the victim of his crimes and claims that DHI somehow violated the CFAA. Nothing could be further from the truth as federal courts maintain that the access and use of publicly-available information is both widespread and permissible. Indeed, just last month, Judge Chen of the Northern District of California issued a decision in *hiQ Labs v. LinkedIn* on this precise issue and rejected Kent's arguments. In that decision, the court held that "[t]he CFAA was not intended to police traffic to publicly available websites on the Internet—the Internet did not exist in 1984" and that "application of the CFAA to the accessing of websites open to the public would have sweeping consequences well beyond anything Congress would have contemplated." *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 3:17-cv-03301-EMC, 2017 WL 2473663, at *5–6 (N.D. Cal. Aug. 14, 2017) (internal quotation marks omitted). Kent's continuing attempts to point the finger at his victim not only displays a continued lack of remorse but also is legally unsupported.

### F.  Conclusion

DHI would like to thank the Court for its attention to this matter and for ensuring that justice is done. When evaluating the appropriate sentence, we hope that the Court considers, among other factors, the impacts that Kent's criminal conduct had on DHI and the unfair benefits that Kent illegally obtained; the repeated nature, scope, and long duration of Kent's criminal conduct; Kent's efforts to sell Oilpro to and consequently defraud DHI of tens of millions of dollars



DHI Group, Inc
www.dhigroupinc.com
1040 Avenue of the Americas Floor 8
New York, NY 10018
212 725 6550

with, in essence, the very information that he had stolen; and finally, the lack of any discernible remorse on Kent's behalf. From DHI's perspective, Kent should serve the maximum time allowable under the law and be ordered to repay every penny of the damages his actions imposed on DHI, his intended loss which was in the tens of millions, and the unjust enrichment that Kent injected into his own company.

Respectfully submitted,

Brian P. Campbell

cc: AUSA Ilan Graff
AUSA Edward Kim
AUSA Sidhardha Kamaraj

Exhibit A

```
                                                                      1

 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE SOUTHERN DISTRICT OF TEXAS

 3                         HOUSTON DIVISION

 4  DHI GROUP, INC., ET AL      §    CASE NO. 4:16-cv-01670
                                §    HOUSTON, TEXAS
 5  VERSUS                      §    FRIDAY,
                                §    JULY 7, 2017
 6  KENT, JR., ET AL            §    10:00 A.M. TO 10:16 A.M.

 7
                         STATUS CONFERENCE
 8
           BEFORE THE HONORABLE NANCY K. JOHNSON
 9               UNITED STATES MAGISTRATE JUDGE

10

11                         APPEARANCES:

12     FOR THE PLAINTIFFS:      BAKER BOTTS LLP
                                Kevin Thomas Jacobs, Esq.
13                              910 Louisiana, Ste. 3200
                                Houston, TX   77002-4995
14

15     FOR THE DEFENDANTS:      GARDERE WYNNE SEWELL LLP
                                James G. Munisteri, Esq.
16                              1000 Louisiana, Ste. 2000
                                Houston, TX   77002-5007
17
       COURT RECORDER:          MONICA BALBOA
18

19

20                   TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 ELDRIDGE ROAD, #144
22                  SUGAR LAND, TEXAS 77478
            Tel: 281-277-5325 ▼ Fax: 281-277-0946
23                 www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.


                  JUDICIAL TRANSCRIBERS OF TEXAS, LLC
```

1        HOUSTON, TEXAS; FRIDAY, JULY 7, 2017; 10:00 A.M.
2              THE COURT:  All right.  Someone tell me what's
3    going on in this case.  What's the dispute?  Over $120,000?
4              MR. MUNISTERI:  So, Your Honor, we would say the
5    real dispute is at max, $120,000 damages in remediation at
6    the very, very best.  What happened --
7              THE COURT:  And yet, Mr. Kent agreed to a $2.9
8    million dollar --
9              MR. MUNISTERI:  Absolutely.
10             THE COURT:  -- restitution.
11             MR. MUNISTERI:  And that's the heart of the issue.
12             THE COURT:  Exactly.
13             MR. MUNISTERI:  And so what happened -- and I
14   wasn't there.  I can only sort of base this like a trial
15   lawyers and let witnesses uphold it -- is that according to
16   the Dice (phonetic) witnesses, they didn't tell the
17   Government what their loss was.
18             They provided this roughly $5 million number just
19   to help the Government understand how the business worked.
20   That's not what the Government told Mr. Cogdill (phonetic).
21   Again I wasn't there, I'm just repeating it.  As I
22   understand it, when Mr. Cogdill met with the Government,
23   they refused to provide any of the documentation that the
24   AUSA was relying on to say what Dice's losses were.
25             In fact, Your Honor asked Mr. Gaither (phonetic)

the one from last year was: Provide your expert report before the deposition. We didn't get it. So at the depositions we got a document. It's not a damage or a loss.

They don't have any real losses, but in the criminal case -- and again, as I understand it -- the AUSA would not provide the information and Mr. Kent made a decision -- based on his criminal counsel's advice -- to enter the plea that currently exists. That's what happened.

We then took the depositions, which are at wild variance with what was told to them -- what the AUSA told them Mr. Cogdill that Dice had told the AUSA. And it's the sort of -- and I'm sure that the two parties have different views about the evidence, as often happens in cases.

But our view is Dice gave information and said their loss was in the millions and it wasn't. That led to the current plea. We then took depositions which showed that their damages are nil and at best $120,000 -- which is actually based on our expert's numbers.

I go through what they provided at their depositions, they don't have any damages. So we've always indicated we'll pay once. We'll pay the real damages.

THE COURT: Who's "we?"

MR. MUNISTERI: When I say "we, it's Mr. Kent. Oilpro is -- Oilpro's never made any money. You know, it's had a loss every quarter. So the "we" is Mr. Kent actually

4

1 being the party who would write the check.
2     At the mediation with -- and again it's in the
3 comments by the mediator, but I'll be short -- the mediator
4 indicated Dice was willing to help Mr. Kent, in essence, in
5 the criminal proceedings. We said: Understood.
6     We indicated that that would have to be at minimum
7 an affirmative statement to the Government that the loss was
8 only within max at $120,000. We understood from the
9 mediator, Dice would do that.
10     And we were in the other room. Mr. Jacobs wasn't
11 in our room. I suspect maybe the mediator asked it a little
12 differently, as mediators need to. I'm not sure. But when
13 she made the proposal, it was for an amount plus the
14 agreement to provide the cooperation -- which I made very
15 clear it needed to be the exact language that we had talked
16 about earlier in the day.
17     And I subsequently confirmed her notes are exactly
18 the same as mine. When we had a call to try to talk about
19 the settlement agreement, it's been absolutely -- it's been
20 stated very definitively by Mr. Jacobs and his
21 partner -- that they will not say that. So that's the
22 reason they're not settling.
23     THE COURT: Okay.
24     MR. JACOBS: May I respond with the offense?
25     THE COURT: Of course.

```
 1            MR. JACOBS:  They say they want to pay once.  We
 2   agreed to that at the mediation.  There was an amount that
 3   the mediator proposed that we would take and that they would
 4   pay.  And it's in excess of $120,000.
 5            THE COURT:  Okay.  All right.
 6            MR. JACOBS:  Okay.  We have agreed they will pay
 7   once.  They're not going to pay once here and once in New
 8   York.  They're going to pay once total.  All in.
 9            At the mediation there was comments made to
10   us -- are there things you might be willing to do to help
11   him with respect to his criminal proceeding, which is
12   now -- which was originally set for hearing in March.  Now
13   it is set September 29th, I believe.
14            THE COURT:  Right.
15            MR. JACOBS:  And we said there were things we
16   can't -- we think we can do.  There are things we can't do.
17   One of the things we were clear that we can't do is we can't
18   affirmatively tell the Government we think the loss is this
19   $120,000 number, which we'd never heard before the
20   mediation.
21            We said, the specific things that came up.  Don't
22   provide a different witness impact statement.  That's asking
23   us before they are doing something.  Okay.  That's fine.
24   Not provide testimony to the Government.  Okay.  That's
25   fine.
```

1       You know, they want to have access to certain
2  documents from the civil case that we've designated as
3  highly protective or sensitive. We can work with you on
4  specific things. We'll need to come to terms on that.
5       Are there some other things that we can probably
6  do? Yes, but not affirmative, you know -- say, look we
7  think he's accepted responsibility and things like that.
8  Yes. Coming in and saying we think the loss is something we
9  don't believe it is -- we can't do that.
10       THE COURT: Okay.
11       MR. JACOBS: We were crystal clear about that.
12       THE COURT: So this whole --
13       MR. JACOBS: The media --
14       THE COURT: Okay, go ahead.
15       MR. JACOBS: -- the mediator is still working with
16  the parties to try to bridge the gap. She's had discussions
17  with us this week. I was in New Orleans the last couple
18  days for Fifth Circuit argument, reaching out to me and then
19  asking me for some thoughts. I have done that.
20       The parties as I understand -- she is still
21  working on it and thinks there may be a path forward. We
22  ought to give her the chance to complete that task before we
23  dive headlong back into this.
24       But the parties reached a settlement amount to
25  resolve this civil case with full dismissal. That is

1  undisputed.  What is hanging us up is asking us to come in
2  and do something in the criminal case that we just can't
3  possibly do.
4          THE COURT:  And this is the problem.  I mean, the
5  fact is that the criminal case is what it is and, you know,
6  I'm not impressed with the fact that he enters a judgment
7  for $2.9 million dollars at the time of his plea.
8          And now all we're doing in my case is trying to
9  impeach that and get around something he did, which is, to
10 me, good luck with that.  And so, the case was
11 dismissed -- remind me when -- what it was -- how many day
12 dismissal order?
13         MR. JACOBS:  It was a 30-day dismissal I think
14 entered on the 26th of June, Your Honor.
15         THE COURT:  26th of June.  Okay.  You know, my
16 inclination is to -- if you can't resolve it by the end of
17 July, then I will reopen but stay it past the sentencing.
18 Because I think either you're going to go forward with this
19 case or you're not going to go forward with this case.
20         But I am not going to be allowing the parties to
21 be playing in my Court over Kent's criminal problems.  It's
22 not my problem.  And I think that's what's happening.
23         You know, that you're using this lawsuit to gain
24 some sort of, you know, retraction or re-litigation on his
25 plea, which frankly I think is a waste of my time to be

```
 1  entering into all these, you know -- a worry in this case.
 2           Either we're going to go forward, either you've
 3  got damages or you don't.  I don't care.  But, you know, for
 4  us to be doing this so Kent can impeach his own agreement,
 5  it's not my concern.  And, you know, I think we either go
 6  forward or not, but the case -- if I reinstate the case,
 7  it'll be after -- you know, it'll be reinstated and stayed
 8  until he's sentenced because it's messing up this case.
 9           MR. JACOBS:  We agree.
10           THE COURT:  We're not being objective in this case
11  because of what's happening to Kent in New York.
12           MR. MUNISTERI:  Understood, understood.
13           THE COURT:  I mean, I don't know what Cogdill's
14  doing on a $2.9 million dollar judgment, but he agreed to
15  that and good luck getting off of it, Mr. Munisteri.  That's
16  all I've got to say.
17           MR. MUNISTERI:  Well, first of all I don't think
18  it's objectionable, but from my perspective, from
19  Mr. Munisteri's perspective, in this Court which is what
20  I -- which is what I am concerned --
21           THE COURT:  It was the entered on the --
22           MR. MUNISTERI:  -- what I'm concerned with --
23           THE COURT:   -- document as a judgment.
24           MR. JACOBS:  It's a consent order of forfeiture.
25           THE COURT:  Yeah, it's a consent order of
```

1  forfeiture.
2          MR. JACOBS: I have a copy right here.
3          THE COURT: Right. I saw -- I looked at the
4  docket sheet.
5          MR. MUNISTERI: As I was saying, what I'm
6  concerned in this Court are civil damages.
7          THE COURT: Exactly.
8          MR. MUNISTERI: And so if there is a judgment that
9  is going to require a payment of $2.9 million to a Plaintiff
10 in a case where the Plaintiff has much less than that in
11 damages -- the offset -- frankly, should obviate this case,
12 but they've not dismissed that. So that's what I have to
13 do.
14         THE COURT: I don't know what you're saying.
15         MR. MUNISTERI: So any payment made under a plea
16 agreement restitution --
17         THE COURT: Exactly.
18         MR. MUNISTERI: -- is legally an offset against
19 any claim damages in a civil case.
20         THE COURT: Do you agree with that? It sounds
21 like it would be.
22         MR. JACOBS: I haven't seen a case --
23         THE COURT: You're only --
24         MR. JACOBS: -- on that point from them. I need
25 to see the case.

1          THE COURT: I mean, I think it's Hornbook Law that
2  you only get one judgment, so we can all agree on that. You
3  get one recovery for your damages.
4          MR. MUNISTERI: And so the concern that we've had
5  all along is when they don't have any real remediation
6  expense. Because they admit that they fixed it themselves.
7  And did it very quickly.
8          And when they have no evidence of the time that
9  they claim they spent -- and in fact, what they have given
10 us are calendar entries from Outlook, Windows Outlook.
11         But when I look at those Windows Outlook calendar
12 entries, they are for meetings that are not recoverable
13 because they are talking to the US Attorney about how to set
14 up Mr. Kent and that's not remediation.
15         So you then look at some of their out-of-pocket
16 expenses and the out-of-pocket expenses are for
17 comprehensive security analysis after they've remediated.
18 Case law is very clear in a civil case, not recoverable.
19         So their receiving under the plea agreement,
20 $2.9 million, when in the civil case -- what we're here
21 about -- they have no damages.
22         And so, we're fine with staying the case. We
23 think the case should be dismissed, by Dice, but if they're
24 not dismissing it, -- I've requested it multiple
25 times -- we'll come back after sentencing.

11

1         THE COURT: I mean, whether or not you've got
2    damages in this case, I don't know. Obviously you're only
3    entitled to one recovery for whatever your damage is. I
4    don't know what that is because I haven't heard any facts,
5    but --
6         MR. JACOBS: And I'm not going to litigate that
7    today.
8         THE COURT: I know, exactly. I'm just concerned
9    -- you know, and the reason I brought you in there -- in
10   here today is just to confirm my impression that this is all
11   over the plea agreement, which --
12        MR. JACOBS: It is.
13        THE COURT: -- not sympathetic to that.
14        MR. MUNISTERI: I made -- so the Court knows -- I
15   urged the other side and the mediator, do not schedule a
16   mediation when we had it. That it was inappropriately
17   timed.
18        THE COURT: So what?
19        MR. MUNISTERI: Well, because it -- you have
20   parallel proceedings. They do.
21        THE COURT: They do.
22        MR. MUNISTERI: And you have one individual and he
23   is affected by both. And so there is a certain order that
24   is helpful and so from my client's perspective -- because I
25   represent just one side -- my client, it was in his best

interests to resolve the matters in New York, in the criminal case, so that any mediation of the civil case could take place after that.

And he would know what the set of facts was. The Plaintiff didn't want to do that. And we understood Your Honor's order as well, to sort of proceed with mediation. So we did. And that's why I'm -- at least from Mr. Kent's perspective -- we're fine with the case being stayed.

THE COURT: You know, Kent could have gotten a stay while his criminal case was proceeding. This happens a lot. He didn't.

All right. Well, at least I know what's going on, so I will if -- obviously try to work it out. I don't care what you do, but I will reinstate the case on or about July 27th and probably stay it pending the sentencing of Mr. Kent. Because, I mean, I think this whole thing is, you know, I think once you resolve that, we'll see where we go. You only get one recovery, so.

MR. JACOBS: That's what we agreed to in the mediation agreement, but the dollar amount is what's -- one pot of money.

THE COURT: Exactly. And it's going to be hard to impeach his order of forfeiture. The judge already entered that, right?

MR. JACOBS: Right.

```
 1            THE COURT:  Yeah.  That's generally done at the
 2  time of the plea.  Judges don't like to take back the orders
 3  that they sign, so good luck on that.
 4            Well, anyway.  You all may go.
 5            MR. MUNISTERI:  Thank you, Your Honor.
 6            MR. JACOBS:  Thank you, Your Honor.
 7            THE COURT:  Thank you for coming in so promptly.
 8        (Proceeding adjourned at 10:15 a.m.)
 9                       * * * * *
10         I certify that the foregoing is a correct
11  transcript to the best of my ability produced from the
12  electronic sound recording of the proceedings in the above-
13  entitled matter.
14  /S/ MARY D. HENRY
15  CERTIFIED BY THE AMERICAN ASSOCIATION OF
16  ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337
17  JUDICIAL TRANSCRIBERS OF TEXAS, LLC
18  JTT TRANSCRIPT #57118
19  DATE:  JULY 13, 2017
20
21
22
23
24
25
```