HA6AAKENS                    Sentence

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          16 CR 385 (DLC)

5    DAVID W. KENT,

6                   Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           October 6, 2017
9                                          12:00 p.m.

10
     Before:
11
                        HON. DENISE L. COTE,
12
                                           District Judge
13

14                         APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     ANDREW KEN-WEI CHAN
17        Assistant United States Attorney

18   DAN COGDELL
          Attorney for Defendant Kent
19
     DAVID SPEARS
20        Attorney for Defendant Kent

21

22

23

24

25
```

HA6AAKENS                        Sentence

1           (Case called)

2           MR. CHAN:  Good morning, your Honor.

3           Andrew Chan, here on behalf of the United States.  I'm

4    joined at counsel table by Evelynina Aslanyan, who is special

5    agent with the FBI.

6           MR. SPEARS:  Good afternoon, your Honor.

7           Dan Cogdell and David Spears, present with Mr. Kent

8    and ready to proceed.

9           THE COURT:  Welcome, everyone.

10          Mr. Cogdell, have you and your client both read the

11   presentence report?

12          MR. COGDELL:  Yes, your Honor.

13          THE COURT:  Have you discussed it with each other?

14          MR. COGDELL:  Yes, your Honor.

15          THE COURT:  Do you have any objections to it other

16   than what might be contained in the written sentencing

17   submissions?

18          MR. COGDELL:  We do not.

19          THE COURT:  Thank you.

20          The presentence report will be made part of the record

21   in this case and placed under seal.  If an appeal is taken,

22   counsel on appeal may have access to the sealed report without

23   further application to this Court.

24          I have two letters from the government of September 22

25   and October 5 yesterday in light of the defendant's sentencing

HA6AAKENS                    Sentence

1    submissions which could be read as challenging the loss

2    calculation here among other things.  My chambers placed a

3    joint call to the government and defense counsel indicating

4    that I wished them to be prepared to address today the

5    forfeiture amount, the restitution amount and the loss amount

6    and as a result I got a letter of October 5 from the

7    government.  I have a sentencing memorandum from the defendant

8    filed in redacted form on September 22.

9            Mr. Cogdell, would you make sure that Ms. Rojas has

10   full versions of the pages that have redactions so that the

11   un-redacted pages can be filed under seal.

12           MR. COGDELL:  Yes, of course.  I thought she had those

13   but I will certainly give them to her.

14           THE COURT:  OK.  And then I have exhibits to the

15   defendant's sentencing memorandum as well and I have an

16   October 4 letter from defense counsel.  I have two submissions

17   from the victim here of September 28 and October 5.

18           Excuse me.  One second.

19           (Pause)

20           THE COURT:  We have in connection with this

21   sentencing, an order for restitution in the amount of

22   $3,292,800.

23           Has that restitution amount been paid, Mr. Cogdell?

24           MR. COGDELL:  It has not, your Honor.

25           THE COURT:  What is the defendant's plan with respect

HA6AAKENS                    Sentence

1    to that?

2              MR. COGDELL:  We will pay as ordered, your Honor.

3              THE COURT:  What does that mean?

4              MR. COGDELL:  We're prepared to pay.

5              THE COURT:  When?

6              MR. COGDELL:  We have 2.9 in Mr. Spears' trust account

7    and we can wire the remainder or the balance whenever.  He has

8    the ability to pay.

9              THE COURT:  OK.  So the 2.9 will be wired today?

10             MR. COGDELL:  It can be, yes, ma'am.

11             THE COURT:  And the remainder will be wired when?

12             MR. COGDELL:  We can effectuate that Monday.

13             THE COURT:  Monday is a holiday.  I'll say Tuesday.

14             MR. COGDELL:  Yes, your Honor.

15             THE COURT:  OK.  Any objection to signing the order of

16   restitution in the amount of $3,292,800?

17             MR. COGDELL:  No, your Honor.

18             THE COURT:  Any objection to having full amount paid

19   by Tuesday?

20             MR. COGDELL:  No, your Honor.

21             THE COURT:  I'm signing the order of restitution and

22   making it part of this sentence.

23             (Pause)

24             THE COURT:  There was an order of forfeiture.  I've

25   signed a consent preliminary order of forfeiture on

December 19, 2016, and that is also part of this sentence.  The

submissions raised in my mind, even though the defendant stated

that it was not challenging the loss calculation, it seemed

that the submissions made were in fact intended to challenge

the guidelines calculation, in particular, the loss amount.  I

want to understand from the government, do they consider that

there was a breach here of the plea agreement?

          MR. CHAN:  Your Honor, based on the text of the

submissions themselves, it appears that they do adhere to the

loss amount of 1.5 million to 3.5 million.  Of course, that

could also be a question that we can direct to the defendants

and ask them if they actually do in fact seek to challenge the

guidelines range that was stipulated between the plea agreement

during the sentencing.

          THE COURT:  Mr. Cogdell.

          MR. COGDELL:  We do not, your Honor.

          THE COURT:  OK.  Thank you.

          I was prepared, given the defense submissions, to

review in some detail the legal standards that apply to both a

calculation of a loss amount, calculation of restitution,

calculation of a forfeiture amount and if necessary, to

distinguish how each of those are calculated.  They each have

their open separate standards and requirements of course from

what might be pursued as damages in a civil case which has its

own separate standards.  None of them are equivalent.  Each

1    stands on its own two feet and is subject to its own analysis.

2    But it doesn't appear any longer based on the oral

3    representations here that I need perform that legal analysis.

4            Counsel, when you address me if you find, if you

5    change your mind and find it is important for me to walk

6    through all those calculations and inquire further to support

7    each of them, I'd be happy to include that as part of this

8    sentencing proceeding.

9            There is an additional condition of supervised release

10   that I want to discuss with counsel and it's based on the

11   defendant's representations in his sentencing submissions.  And

12   that would be an additional condition that he must not invest

13   in, work for or organize any social media business.  If anyone

14   objects to that being a condition of supervised release,

15   please, let me know when you speak with me.

16           The defendant also raises as an issue in connection

17   with this sentence the way that the government chose to arrest

18   him.  I believe the defendant indicates that the government

19   acted on a no-knock warrant and stormed into his home.

20           Mr. Chan, do you want to address that?

21           MR. CHAN:  Your Honor, based on my conversations with

22   the special agent who is responsible for the execution of the

23   search warrant, she informs me that in fact FBI followed

24   standard procedure, knocked and announced their presence and

25   followed standard protocols in executing the search warrant.

1           THE COURT:  Thank you.

2           Mr. Cogdell.

3           MR. COGDELL:  We do not challenge the legality of the

4   execution of the warrant, your Honor.  I didn't mean the

5   pleadings to reflect that.  It was simply the way that the

6   arrest was effectuated, it was traumatic on not only Mr. Kent

7   but of course, his family and his children, his wife and his

8   children.

9           THE COURT:  So were you intending to indicate to me

10  that the agents did not knock?  Did they force their entry into

11  the home?

12          MR. COGDELL:  Judge, it is my understanding that the

13  warrant was executed at six a.m. in the morning and they

14  obtained entry.  Again, we're not challenging the legality of

15  it.  We're just simply raising the issue or whatever it's worth

16  and it may not be the impact it had on his family.

17          THE COURT:  OK.  I'm just trying to understand why you

18  said it was pursuant to a no-knock warrant.

19          MR. COGDELL:  That was my understanding.

20          THE COURT:  OK.  Yes.  But was that to indicate to me

21  that they did not knock and instead forced their way into the

22  home and that traumatized the family?

23          MR. COGDELL:  I do not believe there was a knock that

24  my client heard, your Honor.

25          THE COURT:  So the defendant contends that they forced

1    their way into the home by a battering ram battering down the

2    door?

3              MR. COGDELL:  May I have a moment, your Honor?

4              THE COURT:  Certainly.

5              (Pause)

6              MR. COGDELL:  I'm informed by Mr. Kent, your Honor,

7    that he did not hear a knock.  He was informed -- he was yelled

8    at while he was on the inside there were a number of agents

9    outside with, I think, 10 to 12 agents outside with the number

10   of vehicles with the intendant necessary weapons.

11             THE COURT:  I know, but how did the door get open?

12   Did the agents batter it down --

13             MR. COGDELL:  No, ma'am.

14             THE COURT:  -- or did the defendant open the door?

15             MR. COGDELL:  I believe at this point my understanding

16   is he opened the door pursuant to being instructed, kind of, to

17   come out.

18             THE COURT:  OK.  Good.  Thank you very much.

19             MR. COGDELL:  Yes, your Honor.

20             THE COURT:  So let me raise some additional

21   observations here.  The defendant's sentencing memorandum

22   concentrates on whether people seeking jobs and posting their

23   information through Rig Zone were harmed but doesn't really

24   focus on the harm to the victim here including its employees

25   and and I think it's missing the major thrust of what happened

HA6AAKENS                    Sentence

1    here as I understand it.  And I'm going to lay this out in a

2    little bit of detail to make sure that if I have a

3    misunderstanding of what happened here, you can correct me so

4    that I wouldn't want to impose sentence based on the

5    misunderstanding.

6            The victim paid $51 million to buy Rig Zone in 2010

7    and I believe the defendant was given a salary of $250,000 for

8    a year after that while he remained as president and there was

9    a non compete agreement.  When that non compete agreement

10   ended, the defendant opened Oil Pro and that was in 2013 and he

11   was certainly entitled under the law and under his non compete

12   agreement to build a competing business.  But what he then did

13   almost immediately was hack into the computer system of Rig

14   Zone to steal information that would be valuable to his new

15   business and to his old business.  He targeted the newest

16   members, participants in the Rig Zone venture and then almost

17   immediately reached out to the victim seeking to get it to buy

18   a second company from him, Auto Pro.  And he participated or

19   engaged in a second hacking of Rig Zone in 2015 and attempted

20   that third one in December of 2015.

21           In his negotiations with the victim he sought more

22   than $20 million as a purchase price for Oil Pro.  So there's

23   fundamentally a fraud here besides the computer crime to which

24   he's pled guilty.  There was certainly a breach of loyalty to

25   his former associates and employees at Rig Zone.  It was

1    dishonest and cynical.  His activities by setting up his

2    competing business built on a theft of information from Rig

3    Zone is a little startling to understand.  And he was

4    undermining the integrity of the business he had built and then

5    sought to profit by selling a company for a second time, a

6    competitor he created or built upon stolen information.

7            The defense submissions I think are trying to create a

8    false equivalence with respect to the activity of the victim.

9    They assert that the victim invaded Oil Pro's computer system

10   engaging by implication in the same activity that the defendant

11   engaged in when he hacked Rig Zone's computer system.  I don't

12   think they are equivalent or the same.  And indeed, I don't

13   know that anything that Rig Zone did here or the victim did

14   here was a violation of law but as I understand it, what

15   happened was that public information on Oil Pro's website was

16   scraped.  And it may have been a violation of the terms of use

17   but as sadly, we know in this computerized age there are all

18   kinds of scraping technologies out there that are used everyday

19   of the week by a variety of ventures and there are various ways

20   that one tries to prevent your information being scraping.  But

21   it is of an all together different kind of activity than the

22   kind of hacking in which the defendant engaged.

23           I'm laying that out so if I've misunderstood something

24   you can correct my impression.  Good.  Let's talk about the

25   guidelines here.

1          There is a guidelines stipulation of an offense level

2     23, a criminal history category of one, with a guideline range

3     you 46 to 57 months.  The probation department recommends a

4     sentence of 36 months which is a variance.

5          The defendant has argued for a variance below that 36

6     months by emphasizing the fact that the defendant's cooperation

7     with the law enforcement investigation was not considered by

8     the probation department when it made its recommendation.  It's

9     emphasized the defendant's charitable work from as far back as

10    his college days.  It's referred to other sentences and argued

11    that it would result in disparate treatment of the defendant to

12    sentence him to a longer period of incarceration than some of

13    those comparators.  And of course it's emphasized that this is

14    his first criminal conviction.

15          I'll hear from the government.

16          MR. CHAN:  Your Honor, as the Court is aware, the

17    government is recommending a substantial term of incarceration

18    in this case but one that ultimately is less than the

19    guidelines range that's suggested in the presentence report.

20    And I think we have to start with the proposition that what the

21    defendant did and as the Court has observed, was an incredibly

22    serious offense.

23          And, your Honor, we do in large part agree with the

24    defendant, the Court's characterization of the conduct in its

25    statement.  And we wanted to just highlight a couple of aspects

HA6AAKENS                        Sentence

1    of the defendant's conduct.

2              I think the first is that this story begins, as the

3    Court observed, with what appeared to be a success story.   An

4    individual with an entrepreneurial spirit, founding a company

5    and selling it for a huge sum of money, $50 million in --

6              THE COURT:  Or 51.

7              MR. CHAN:  $51 million in 2010.  That's a success

8    story.  That's coming up with a business idea and coming up

9    with a business plan that made a lot of money and had over

10   $900,000 active users on its website using that program to

11   final jobs in the oil and gas industry.

12             But unfortunately, this case ultimately is a story

13   about greed.  It's a story about how this defendant was not

14   satisfied with that sale and set out to start a new venture.

15   And instead of going into that venture lawfully, he chose to

16   violate the law.  And we laid out in our sentencing submission

17   the numerous ways in which this crime was an incredibly

18   sophisticated one.  The use of a virtual private network and

19   the name of the private network was Hidemyass.com, the use of a

20   virtual private network to mask his internet protocol address

21   so that the victims wouldn't be able to identify who was the

22   user hiding behind that computer screen downloading hundreds of

23   thousands of resumes from their data business, the use of

24   intimate knowledge of the Rig Zone system, intimate knowledge

25   that even many members of the Rig Zone company weren't aware of

HA6AAKENS                          Sentence

1    and had to hire outside contractors to discover, and all the

2    while still engaging in these conversations with the victim

3    encouraging them to move forward in making him an offer to

4    purchase this additional company and suggesting that $20

5    million at a minimum would be a reasonable price to purchase

6    this new company.

7           Your Honor, the defendant has been charged with one

8    count of intentionally accessing a protected computer without

9    authorization.  In many ways this could have been charged as

10   800,000 separate counts because over the course of three years

11   from October of 2013 through December of 2015, that's what he

12   did.  He designed an automated system that allowed him to

13   access 796,000 times this protected computer without

14   authorization taking their valuable data.

15          Your Honor, the other thing that we wanted to

16   highlight is that one of the things that's perhaps sometime

17   lost in an individual case like this is that we live in an age

18   now where our computer infrastructures are frequently under

19   attack.  We see news articles seemingly every single week, if

20   not every single day about important companies and important

21   government agencies and infrastructure that have their

22   databases breached and hacked.  And it's only in a very small

23   subset of these cases where we're successfully able to identify

24   the wrong doer.

25          This is an extremely unique case.  We are very

1    fortunate in a lot of ways in this investigation because the

2    FBI was able to get involved at an really stage and was able to

3    track the defendant's activities in December of 2015 when he

4    attempted to hack that third time.  We were very fortunate to

5    have the cooperation of law enforcement in the United Kingdom

6    who were able to get us the records from this Hidemyass BPN

7    which showed that the Internet protocol address being used by

8    the defendant was one who was committing these hacks.

9        But there are so many cases that the government

10   investigates where there's been similar network intrusions

11   where we're ultimately not able to find out who the wrong doer

12   is.  And so we do believe, your Honor, that both specific

13   deterrence and general deterrence are significant grounds for

14   the Court to impose a significant term of incarceration here.

15       That being said, your Honor, the Court also has to

16   consider the personal characteristics of this defendant.  And

17   the government has no dispute from this side of the table that

18   the defendant is not solely defined by his crime that he's

19   committed.  I think that his sentencing submission and the

20   presence of his family members here today in court are all

21   indicative that the defendant is a good father, a loving

22   husband, a very good friend and generous to those who are close

23   to him and he obviously has a lot to contribute to this country

24   and to this society seeing as he created this company from the

25   ground up that's worth tens of millions of dollars.

1          We also don't dispute the representations in the

2     defendant's submissions about his attempts to provide

3     cooperation to the government.  His statements about how he was

4     able to assist law enforcement in apprehending another computer

5     hacker in the oil and gas space is absolutely correct.  And

6     Judge Castel sentence that defendant to I believe 18 months of

7     imprisonment last month.

8          For those reasons, your Honor, because the defendant

9     does seem to have a low likelihood of re-offending, because his

10    cooperation with the government and his agreement to plead

11    guilty in this case do appear to show that he has legitimately

12    become remorseful of his previous crimes and because we do

13    believe that there will be significant financial penalties in

14    this case including the forfeiture, including the full

15    restitution that will be paid to the victims, the government

16    does believe that under the Section 3553(a) factors that a

17    sentence that is incarceratory and that's significant but that

18    is less than the guidelines range recommended that's laid out

19    in the presentence report, we do believe that such a downward

20    variance would be warranted in this case.

21          THE COURT:  Mr. Cogdell.

22          MR. COGDELL:  Thank you, your Honor.

23          I don't know where to start so I'll do the best I can

24    because it appears to me that my pleadings, our pleadings have

25    done more harm to my client than good which disappoints me

greatly.  I feel it only fair to point out from a 30,000 foot

level that the intention of talking about the loss calculations

was not meant to attack or undermine our plea agreement.  In

fact, as Mr. Chan alluded to in one of the sentencing

memorandums, the government and the defense had numerous

meetings about the loss calculations before the plea agreement.

They were professional.  They were accessible.  They were

appropriate but we were wide apart on what the numbers were.

At the end of the day we did not have the benefit of

depositions.  We had our expert, Neal Beaton, who had done a

tremendous amount of work parenthetically and is probably no

longer now, but when the Court notified Mr. Spears yesterday

when we flew in Mr. Beaton to talk about the loss calculations

but given the Court's opinion, I don't think I want to go

there.

THE COURT:  Well, what do you mean, my opinion?  If

there is a dispute I am absolutely anxious to hear everyone and

I am absolutely prepared to hear argument about the loss

calculation.

MR. COGDELL:  Well, the reason to be clear that we are

raising or raised the issue of lost calculation was because we

thought the actual loss to Rig Zone was much less than we had

previously agreed to.  And when the depositions occurred,

judge, we're in a Hobson's choice and the depositions to me --

and again, I may view it with different eyes than the Court,

1    but the depositions to me clearly demonstrated the loss

2    calculations were different than we agreed to.  So I have, we

3    have the Hobson's choice of not doing anything and not raising

4    those issues with the Court and being chided as ineffective

5    later on or submitting them and arguing them and potentially

6    running into the Court's perception that we're trying to breach

7    the plea agreement or considering close to that line.  Nothing

8    was intended to possibly constitute a breach of the plea

9    agreement.

10         THE COURT:  So Mr. Cogdell, I feel like you're digging

11   a bigger hole here.  So, let's just step back a moment.

12         MR. COGDELL:  Yes.

13         THE COURT:  OK.  The government will or won't take the

14   position that you've breached the plea agreement.  If they are

15   not raising the issue -- and I always raise this.  Usually,

16   well, I raise it with the government or the defendant at every

17   sentence when the issue might be appropriate to be raised

18   because I need to know whether or not somebody is going to take

19   the position that there's been a breach of the plea agreement.

20   That has ramifications.

21         MR. COGDELL:  Of course.

22         THE COURT:  I've raised it here.  The government is

23   not taking the position as of this moment that there's a

24   breach.  I have no idea if it will before I impose sentence.

25         Two, you have a letter from the government of

1  October 5 laying out in exquisite detail how it arrived at a

2  loss calculation here.

3          Now, you agreed in a plea agreement to a loss

4  calculation that was a premise for a guidelines range.  You can

5  dispute that if you want even though you have a plea agreement.

6  That's just fine, and that's appropriate to do here if you

7  want.  But you have the government's letter of October 5.  I

8  expect you had its oral presentation earlier, but at least as

9  of October 5 you have its statement explaining its basis for a

10 calculation.  I don't understand anything you have said in your

11 papers or are saying to me orally now that disputes either the

12 methodology or the figures in the October 5 letter.

13         The issue of how much a party spent on an internal

14 investigation of a breach of its computer system and to remedy

15 that problem is an interesting component but it is only a

16 component of a loss calculation.  So, if you want to contest

17 the loss calculation as laid out in the October 5 letter from

18 the government, I'm happy to give you that opportunity.

19         MR. COGDELL:  May I have a moment to confer with

20 Mr. Spears and my client, your Honor?

21         THE COURT:  Sure.

22         (Pause)

23         MR. COGDELL:  Your Honor, if I could have Mr. Spears

24 address the Court?

25         THE COURT:  Sure.

HA6AAKENS                    Sentence

1          MR. SPEARS:  May I, your Honor?

2          THE COURT:  Sure.

3          MR. SPEARS:  So it should be clear we are not

4    disputing the loss calculation in the plea agreement.  We do

5    not intend to take any action that would lead anyone to

6    conclude that we have disputed the loss calculation.  It is our

7    understanding of the law in this circuit and else where that

8    under 3553 the Court may consider whether the particular loss

9    calculation agreed to overstates the seriousness of the offense

10   as a variance factor.  That is the context in which we raised

11   it.  We have never -- we've done our best with the government.

12   They've stuck with this number.  We understand that.  We

13   respect that and we stuck with the number too.  But we did

14   raise it with the Court in the context of a possible variance

15   under 3553.

16         THE COURT:  Well, I don't know what number you're

17   sticking with.  It seems to me there's no dispute about the

18   numbers.  There could be a dispute about the methodology that

19   arrives at a set of numbers.  The government -- your, as I

20   understand from the papers, want the Court to focus on only one

21   component of the government's loss calculation.  It has

22   taken -- and I think this is a conservative number -- 360,000

23   as mediation and investigation costs.  I think there is some

24   support for a far larger number in the papers.  I have

25   something over 400,000 as a number.  And of course this doesn't

HA6AAKENS                    Sentence

1      count at all, the amount of time and energy cooperating with

2      the government investigation which theoretically could be also

3      included.

4              So to me your dispute is, if I understand it and it's

5      not clearly state today me what the argument is, is that you

6      would like me to just focus on let's say the 360,000 dollar

7      figure and not think about the rest of the calculation as is

8      described in the government's letter which has to do with the

9      valuation of the significance of the theft.

10             MR. SPEARS:  If I may differ with the Court, our

11     argument is that in the discovery that took place in the civil

12     proceeding the plaintiff in that case, the victim admitted

13     through a variety of mouths that they have had no cognizable

14     loss and we learned that for the first time when the discovery

15     occurred.  We learned about Mr. Chan's approach to valuation at

16     the time when we got his letter yesterday.  And our argument is

17     that notwithstanding the methodology employed by Mr. Chan which

18     we have agreed, we've agreed to the result, we believe that in

19     terms of considering our argument for a variance, the Court can

20     consider whether the loss amount agreed to overstates the

21     seriousness of the offense.

22             We have a variety of factors that we would rely on to

23     make that argument to the Court.  We brought an expert today

24     after we heard from the Court's deputy clerk yesterday.  We are

25     not disputing the terms of the plea agreement.  We're not

HA6AAKENS                    Sentence

1    trying to get away from the number we agreed to there.  We're

2    invoking those cases that say defendant can, nonetheless, argue

3    to the Court that a further examination of the loss amount

4    supports a variance.

5              THE COURT:  Mr. Spears, are you disagreeing at all

6    with the methodology described in the government's October 5

7    letter which tries to create a valuation of the stolen

8    information?

9              MR. SPEARS:  We do not dispute it for purposes of our

10   agreement with the stated loss amount, the stipulated loss

11   amount.

12             THE COURT:  Do you dispute it as a proper methodology

13   to employ under the law with respect to arriving at a loss

14   calculation?

15             MR. SPEARS:  No.  We have an alternative method of

16   valuation that we were prepared to present to the Court that we

17   are prepared to present to the Court that results in a much

18   lower number.  And we have argued that in lawyer lay terms in

19   our sentencing memorandum that it supports our argument for a

20   variance.  It's a very different methodology, a very different

21   number.  We ask the Court to consider that in connection with

22   our requests for a variance under 3553.

23             THE COURT:  Well, if you would like to present

24   evidence or argument in connection with the sentence, of

25   course, this is the time to do it.  If that's the way you wish

1    to proceed, I'm absolutely happy to hear you.

2            MR. SPEARS:  Well, we are content to rest on the

3    arguments we made in our papers to that effect.  We have an

4    expert here who we're prepared to call.  Just want to say again

5    that we are not going back on our commitment in the plea

6    agreement and we believe that it is open to the Court to

7    consider the variance argument we're making but we do not

8    intend to take any steps or step that could be interpreted as a

9    repudiation plea agreement.  I just want to be perfectly clear

10   about that.

11           THE COURT:  Well, it's your decision whether or not

12   you wish to call an expert.  I am not going to make that

13   decision for you.  That would be inappropriate.  So you have to

14   decide whether you want to call an expert or not.

15           MR. SPEARS:  May I confer with counsel and my client

16   momentarily, your Honor?

17           THE COURT:  Yes, ma'am.

18           (Pause)

19           MR. SPEARS:  May I, your Honor?

20           THE COURT:  Yes.

21           MR. SPEARS:  We are not going to call the expert.  We

22   are going to present nothing further on this subject.  We hear

23   the Court and we're ready to proceed.

24           THE COURT:  OK.  Mr. Cogdell, I don't believe you

25   you've completed your statement to me.

HA6AAKENS                    Sentence

1         MR. COGDELL:  I did not.  I just wanted to point out,

2    you asked me to suggest to you if I took issue with any of your

3    observations.

4         THE COURT:  Please.

5         MR. COGDELL:  And a couple.

6         First, I respectfully disagree that Mr. Kent was

7    trying to sell Oil Pro to Rig Zone in January of 2014.

8         THE COURT:  Well, to the victim.

9         MR. COGDELL:  To the victim, yes.

10        At that point, of course, in the chronology of things,

11   the victim was aware of hacks and Mr. Kent was not aware that

12   the victim was aware of the hacks.  So from that standpoint

13   Mr. Kent came to New York at the request of the victim and what

14   he was looking for was not a purchaser but a valuation, a

15   metric, a number, if you will.  The 20 million dollar number

16   that keeps being tossed around or quoted comes from Mr. Kent

17   was discussing the value of the software of Oil Pro.  It was

18   different in kind from the value or from the format and the

19   assets of the software of the victim.  He was extolling the

20   virtues of the software of Oil Pro.

21        They ask him if he had investors.  And he said I have

22   another investor who invested three million dollars and he has

23   15 percent of the company.  Well, if you do the math on that

24   that translates into a 20 million dollar valuation.  But it is

25   my understanding that at no time did Mr. Kent say if you give

1    me $20 million, I will sell you the company.

2            As the Court is probably aware more keenly than I,

3    start-up companies like this, one of the hardest things to do

4    is to establish the valuation.  And that was the purpose of

5    Mr. Kent's trip to New York, not to sell the company but to get

6    a number and proceed from there.  He had no intention of

7    selling Rig Zone to the victim but he was looking for investors

8    in many places and wanted to see if there was an interest

9    there.

10           So I do not believe there was a fraud, respectfully.

11   I believe that what Mr. Kent was doing was different than what

12   the victims were doing because they were aware that he had

13   hacked and they were, they, the victims were understandably

14   asking him questions about how many members, how did you get

15   them, why they were there?  Certainly, we concede the fact that

16   Mr. Kent wasn't completely fulsome about that but we do not

17   believe there was a fraud and that's why we didn't -- just

18   jumping way sideways for a minute if you could follow my

19   colloquy -- at the time when Mr. Kent was cooperating he did

20   not receive a plea agreement or a cooperation agreement.  He

21   did not receive a cooperation agreement here in New York

22   because he would not agree to replead and include the fraud

23   case.  As his counsel we did not believe that Mr. Kent was

24   guilty of the fraud case.  Certainly, he was guilty of the

25   hacking case but we did not believe he had the intention to

1     defraud.  We did not believe that Mr. Kent's failure to be a

2     hundred percent fulsome about the source of all his data

3     constituted a fraud.  That is the primary disagreement I have

4     with the Court's observations.

5          The other in terms of the false equivalency, just

6     highlighting that for a minute, your Honor, I don't think we

7     were suggesting for a minute or weren't trying to suggest that

8     Rig Zone was just as guilty as Kent.  Rather, we were pointing

9     out to the Court that the scraping that was engaged in by the

10    victim was done with many of the same character traits, if you

11    will, of the hack of Mr. Kent.  The primary similar aspect of

12    it was using a computer program using a -- and using non --

13    Whether the Court feels like the victim's failure to disclose

14    to the FBI and law enforcement and the government that it was

15    scraping which was certainly we believed to be a violation of

16    the terms and conditions of the user agreement is up to the

17    Court.

18         But if I could, those observations having been said,

19    I'd like the opportunity at some point to address why we feel

20    like Mr. Kent should get a non guidelines sentence.

21         THE COURT:  Sure.  Absolutely.

22         MR. COGDELL:  There are really three issues on the

23    table at present, your Honor, why I think that a non guidelines

24    sentence is appropriate.  And perhaps educating the Court more

25    than I should, I have spent a tremendous amount of time with

HA6AAKENS                    Sentence

Mr. Kent over the last year and a half and I have gotten to

know him not only as a client but as an individual.  And I

realized and recognize it's a dangerous thing to do to vouch

for your client but I've seen what he has gone through.  I have

seen how he has been eviscerated.  I have each seen how it has

changed his life in some horrible ways and a couple of good

ways.

         But focusing on the positive for a moment, after

Mr. Kent made the decision to plead guilty, in the valuation

quest where we were trying to convince the government that

their loss calculations were high and ours were appropriate,

one of the things that Mr. Kent did was buy resumes from this

fellow named Kevin Forbes.  It was above the table.  It was

nothing anything but appropriate about that and we used the

purchase of those resumes to try to encourage the government to

see a lower loss calculation from our side.  He purchased them

from a number of different people but in sort of an effort to

set the market or establish a price.  That's how he came in

contact with Mr. Forbes.  Later on Mr. Forbes approached

Mr. Kent as detailed in the papers and suggested to him that he

had some resumes that were obtained improperly and asked

Mr. Kent if he wanted to buy them.

         Being completely candid with the Court, this was in

the September timeframe of last year.  We didn't know if

Mr. Forbes might have been some sort of agent for the

government or Mr. Forbes was acting on his own.  We didn't

report that to the government because we didn't know what his

true purpose was, that is, if he was really an agent of the

government or he was simply an individual looking to advantage

himself improperly.

After Mr. Kent's plea we met with the government.  We

came up here on numerous occasions, met with the FBI agent

that's present in the courtroom.  There's another FBI agent,

Mr. Merriman, who is in the back.  I made, Mr. Spears and I

made the unusual step of turning our client over to the

government.  We didn't need to be in the phone conferences.  We

didn't need to be in the e-mail exchanges.  We let the

government have complete and full access to our client.  And

frankly, the reason that we did that was we trusted our client

and that trust paid off.  But there was a series of

communications arranged effectively by the government with

Mr. Kent's participation and assistance which ultimately

arranged for Mr. Forbes to come over here from overseas, met

here in New York.  There were dinners involved, lunches

involved, downloads involved and pleading to point out.  The

agents were in the next room and ultimately Mr. Forbes was

arrested and pled guilty.

All of that solely because Mr. Kent made the decision

to cooperate.  All of that solely because or in spite of the

fact that he didn't have any cooperation agreement which in my

1    view makes his cooperation more commendable than not.  The

2    government was not obliged.  We had no guaranteed

3    recommendation, nudge, nudge, five case coming, don't worry

4    about it.  He did it on blind faith and he did it for the right

5    reasons.

6           I've never had a client do that.  Maybe it's done

7    here.  You do things differently in the great state of New York

8    than we do in Texas.  That's of no moment but that's a first

9    for me, truly.

10          The other thing that is hard for me and these

11   circumstances -- not to get emotional about it because I'm

12   moved by it -- but his charitable work and his character is

13   amazing.  I mean, as pointed out in the papers, when most of us

14   in college were doing something else on Saturday mornings not

15   near as noble as what Mr. Kent was doing, he was working for

16   Big Brothers/Big Sisters.  He and his lovely wife, Casey, got

17   married.  They donated a house through Habitat for Humanity out

18   of the goodness of their wallet.

19          I've never seen a situation where an individual like

20   Mr. Kent who is going through problems with alcohol, met

21   another man, as detailed in the pleadings, in Alcoholics

22   Anonymous and that fellow was homeless at the time and he

23   bought him a house.  That's not only impressive to me.  That's

24   amazing to me.  This was never thought he would be arguing that

25   asset, if you will, in the district court 15 years later but it

1    speaks to his character then and it speaks to his character

2    now.

3              After that same individual lost his job Mr. Kent lent

4    him money to start a business.  His assistance to others is

5    simply outstanding.  The fellow I am speaking about is Troy

6    Carewell.  Mr. Kent has remained, even though he made a

7    substantial amount of money, he's remained extremely charitable

8    post the sale of Rig Zone.  He is active in his church.  He has

9    shut down Rig Zone.

10             THE COURT:  "Oil Pro".

11             MR. COGDELL:  I'm sorry.  Yes.  "Oil Pro".  Thank you.

12             He has shut his company down.  He cannot and will not

13   reoffend.

14             His relationship with his wife and his three children

15   is detailed in the pleadings and it's extraordinary.

16             I understand the Court's angst with our raising the

17   issue concerning the loss calculations from a 3553 standpoint,

18   but if there was a fault there, that fault is with me.

19             THE COURT:  Well, I am not disputing the relevance of

20   the issue.  I'm disputing the tone and tenor of the argument --

21             MR. COGDELL:  Yes.

22             THE COURT:  -- and the lack of recognition of the

23   extent of the fraud here, the willingness to blame the victim

24   as opposed to taking full acceptance and responsibility for

25   one's own misconduct, the efforts to minimize, I think it was

1    an unusual approach in my mind because the bottom line facts

2    are not in dispute.  I mean, the theft of data, the effort to

3    get more money out of the victim having already gotten 51

4    million and to get that more money out of the victim based on

5    stolen information from the business you built, I mean, there

6    is just a sadness about this case that is deeply compelling.

7           MR. COGDELL:  Again, your Honor, Mr. Kent did not

8    draft the sentencing memorandum.  I did and Mr. Spears did.

9    And if there's fault, it should be laid and it's certainly

10   accepted here.  But regardless of those mistakes on my part, I

11   don't think that it's anything but correct to look at the other

12   positive things that we've seen in this case which is his

13   cooperation, which is his charitable work, which is his

14   relationship with wife, which is his relationship to the

15   community, which is his relationship to his church.  Any and

16   all of those things, particularly bundled together, are a

17   significant driver in my respectful opinion for a significant

18   departure downward variance from the guidelines.  And I don't

19   want to beat this horse any more but I can't apologize enough

20   if my pleadings, these pleadings have -- to the negative of my

21   client.

22          THE COURT:  Thank you, Mr. Cogdell.

23          Mr. Kent, is there anything that you wish to say on

24   your behalf in connection with this sentence?

25          THE DEFENDANT:  Yes, your Honor.

1          First, I'd like to say that I'm deeply remorseful for

2     my actions.  With every fiber in my body I wish I could go back

3     and change the actions that I took and the harm and pain that

4     it's caused to other people.  I ask for their forgiveness.

5          Back in December of 2016 I had the opportunity to meet

6     with the officers of Dice Holdings, the victim, and at that

7     time I apologized to them, and I wonder if they will forgive

8     me.

9          The last 18 months have been obviously very difficult

10    for me and my family which they should be.  There hasn't been a

11    day that's gone by that I haven't thought about this case and

12    thought about my wrongdoing.  I take full responsibility for my

13    actions.  No one made me do anything.

14          As I have reflected back on what happened and what led

15    me astray I come back to two events.  The first was back when I

16    was employed by the victim and even prior to that there was a

17    web address that was accessible that where you could download

18    resumes and I went and I checked it and I copied resumes and

19    that was wrong and I knew it was wrong at the time.  And I have

20    a spiritual adviser and I went to him and I said this is what I

21    did and I feel really bad about it.  And he even gave me a

22    book.  He said you need to read this book and it was called

23    'Cheaters Never Win'.  I read that book and I said, I told

24    myself, I'm not ever going to do this again.  And more than a

25    year and a half elapsed and I had not done anything.

1          And then I think at that point I made my gravest

2     mistake was after I learned about resumes being taken from my

3     own website, I got angry and I was upset and I retaliated which

4     was absolutely wrong.  It was the wrong response and I wish I

5     could go and un-push those buttons so badly.  I never thought

6     that those actions would bring me here in front of you.  I

7     didn't at that time understand the gravity of copying the

8     resumes but I certainly do today.  My actions have caused so

9     much pain and suffering, so much suffering.

10          My wife is diagnosed -- excuse me.

11          (Pause)

12          THE DEFENDANT:  My wife is diagnosed with PTSD and she

13     is recovering and she knows I love her very much.  My three

14     children are in therapy because they were a part of a lot of

15     this and they have had problems.  But I pray that they'll be OK

16     in the end and they know that I love them and it was my actions

17     that caused that.  I'm also deeply sorry to my parents for

18     having to endure this.  They did not teach me to behave like

19     this and I've asked them for their forgiveness and I have

20     received that from them.  But I think I'm certainly, I'm very

21     sorry for any harm that has come to Dice whatever that may be.

22     I honestly don't know the full extent of what the damages were

23     but I accept I'll pay, et cetera, whatever I need to do which

24     has been made clear.

25          But I think that the thing that bothers me the most

HA6AAKENS                      Sentence

about my actions is that I dishonored my God because I've

always lived a christian life and I was taught to lead a life

of that Christ would and I fell so far short of that.  I think

my sin was at first I thought it was agreed but I already had

plenty of money.  Money wasn't driving me.  People asked me, it

was like why would you do that?  You already had enough money.

And I think after reflection and prayer, my true sin was pride,

trying to prove to myself that I could build another company

again and I took a shortcut and while only not to downplay what

I did, only four percent of my six hundred thousand numbers

came from these hacks.  But that doesn't matter.  I still did

wrong.

          I'm a beaten man.  I'm definitely a beaten man but I

have been humbled to a state that I never thought I could get

to and I believe that God is rebuilding me up to be the person

that he wants me to be and that is one of the reasons why I

shut down my company.  My family and I lost $6 million when I

shut down that company.  I felt it was the right thing to do

and I feel called to lead a life of service for other people.

          This whole experience has, "change" isn't even the

right word.  I'm hurt from all of this but I'm also glad that I

was derailed because now I can have a more fruitful and better

life.  And so I just ask your Honor, I ask for mercy and I can

promise you that no one will ever see my name as any part of

wrongdoing ever again.

HA6AAKENS                    Sentence

1          Thank you for --

2          THE COURT:   Thank you, Mr. Kent.

3          Please stand.

4          I don't know that I have much more to say, Mr. Kent,

5    than what I've already said.   I think the fundamental thrust of

6    what you did here is not so much of economic crimes.   It's

7    really a betrayal of trust and a breach of loyalty and a level

8    of deceit and dishonesty that was very, very sad and

9    disappointing.

10          That said, I certainly agree that the guidelines range

11   is not representative of what would be a reasonable sentence

12   here, and so the issue for me is how deep a variance to grant

13   from the guidelines range.   Probation recommends a variance

14   that would result in a three year term of imprisonment.   I

15   don't think that's necessary either.

16          I do think that because of the seriousness of the

17   crime, the complexity of the criminal activity, the ongoing

18   nature of it, the repeated nature of it and even the

19   negotiations with the victim afterwards, all suggest here that

20   very serious misconduct took place and it is deserving in terms

21   of punishment and is a matter of general deterrence, a period

22   of imprisonment.

23          In terms of individual deterrence I would like to

24   believe you when you make this commitment to me that you have

25   learned your lesson and will change the thrust of your life to

HA6AAKENS                      Sentence

1   build upon the good that is within you and has always been

2   there and to make sure that you don't repeat the criminal

3   conduct in which you chose to engage over this several year

4   period of time as reflected in your plea of guilty.

5           So I'm going to impose a term of imprisonment of a

6   year and a day, to be followed by a term of supervised release

7   of three years with the following special conditions:

8           You must cooperate in the collection of DNA.

9           You must comply with the standard conditions of

10  supervised release.

11          You must participate in a program approved by the

12  probation department for alcohol abuse.

13          You must submit to a reasonable search by the

14  probation department.

15          You must seek and maintain full-time employment.

16          You are to provide the probation department access to

17  any and all requested financial information.

18          You must not incur any new credit card charge or open

19  any new credit line without approval of the probation

20  department.

21          You must comply with their probation department's

22  request for a reasonable search of your computer equipment as

23  reflected on page 36 of the presentence report?

24          You must not invest in, work for or organize any

25  social media business.

HA6AAKENS                    Sentence

1          You must perform 200 hours of community service per

2     year for each year of supervised release in a program approved

3     by the probation department.

4          You shall notify the U.S. Attorney's office for this

5     district within 30 days of any change of mailing or residence

6     address that occurs while any portion of restitution or

7     forfeiture remains unpaid.

8          You're required to pay the full amount of restitution

9     by this coming Tuesday.

10          You shall be supervised in the district of your

11    residence.

12          You shall pay a special assessment of $100.

13          I am imposing a fine of $20,000.

14          I've already stated the restitution and the forfeiture

15    amounts.

16          You shall pay any remaining amounts due and owing with

17    respect to restitution or forfeiture while in prison or

18    following imprisonment at a rate of 20 percent of your gross

19    monthly income.

20          THE COURT:  Counsel, is there any legal reason why I

21    cannot impose the sentence I've described as stated?

22          MR. COGDELL:  There is not, your Honor.

23          MR. CHAN:  No, your Honor.

24          THE COURT:  I order the sentence I've describe on the

25    record to be imposed as stated.

HA6AAKENS                    Sentence

1            You may be seated, Mr. Kent.

2            I believe there are open counts?

3            MR. CHAN:  Yes, your Honor, and the government would

4     move to dismiss any open counts with respect to this defendant.

5            THE COURT:  Your application is granted.

6            Mr. Kent, I need to advise you of your right to

7     appeal.  You've largely given up your right to appeal because

8     of the plea agreement and because of your plea of guilty but,

9     nonetheless, I'm required by law to advise you of the

10    following:

11           If you are unable to pay the cost of an appeal, you

12    may apply for leave to appeal in forma pauperis.  Any notice of

13    appeal must be filed within 14 days of the judgment of

14    conviction.

15           Counsel, is there anything else we need to do?

16           MR. CHAN:  No, your Honor.

17           MR. COGDELL:  No, your Honor.

18           THE COURT:  I'll going to allow the defendant to

19    surrender.

20           You must surrender by November 27 at two p.m. at the

21    designated institution.

22           MR. COGDELL:  One query, your Honor?

23           THE COURT:  Yes.

24           MR. COGDELL:  It is my understanding that the courts

25    in this jurisdiction do not make recommendations as to

HA6AAKENS                    Sentence

1    placement.

2            THE COURT:  I will not recommend a specific

3    institution.  I'll recommend a location.  For instance, do you

4    want a designation if possible to the state of Texas?

5            MR. COGDELL:  Absolutely, yes.

6            THE COURT:  I'll make that recommendation.

7            MR. COGDELL:  Thank you.

8                            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25